JOSEPH B. JENNINGS v. JOHN SCARBOROUGH, BISHOP.; ALFRED E. BAKER ET AL.; THE STANDING COMMITTEE, &c.; SAMUEL ELLIOTT ET AL., AND THE RECTOR, WARDENS AND VESTRYMEN OF GRACE CHURCH IN WESTFIELD, NEW JERSEY.

1. Courts of law will not interpose to control the proceedings of ecclesiastical bodies in spiritual matters which do not affect the civil rights of individuals. But when the civil rights of an individual are involved, jurisdiction is committed to the courts of law to protect those rights which the court cannot discard.

2. The call of a rector by the vestry, and the acceptance of such call, creates a contract for the payment of the stipulated salary so long as the pastoral relation continues. This contract is a civil right which the courts will protect and enforce.

3. By a canon of the Protestant Episcopal Church a rector canonically elected and in charge cannot resign his parish without the consent of the parish or its vestry, nor can such rector be removed therefrom by the parish or its vestry against his will, except upon the dissolution of his pastoral connection in the manner and by the authority designated in other canons.

4. In the diocese of New Jersey, when there are differences between a minister and his congregation which cannot be brought to an amicable conclusion, the procedure for dissolving the pastoral relation is prescribed by sections 3 and 4 of canon 4, title 3. Section 3 provides that when the matter cannot be amicably settled within a reasonable time the bishop shall convene the standing committee and shall give notice to the parties to appear before them and present their proofs and arguments at such time and place as he shall appoint. Section 4 provides that when the hearing shall be concluded the bishop shall make such order in regard to the matter as he may think just and for the true interests of the church, and such order may require the rector to resign his rectorship and may require the church to pay a sum of money to the rector; and it is made the duty of the rector and of the church and every member thereof to submit to and abide by such order, &c., with a proviso that no order shall be made unless with the advice and concurrence of at least a majority of the standing committee, who shall have been present at the hearing. *Held*—

1. That by sections 3 and 4 of the canon a special tribunal was created, consisting of the bishop and the standing committee, for the hearing of proofs and arguments presented before that tribunal.

2. That the prosecutor was entitled, as of right, to present his proofs before the bishop and the standing committee, and to a hearing before

that body on the proofs presented by both parties, especially as the determination of that tribunal might deprive him of property rights which enured to him in virtue of his rectorship.

3. That the order under review having been made without hearing proofs, and not being in compliance with the procedure prescribed by the canon, was irregular.

4. That the order being one affecting the civil rights of the prosecutor, in that if valid under the law of the church it terminated his contractual relation with the parish, is therefore reviewable on *certiorari.*

---

On *certiorari* to review an order of the bishop of the diocese of New Jersey dissolving the pastoral relation between the prosecutor, as rector, and the parish of Grace Church in Westfield.

The order in question is in these words:

"At a meeting of the Standing Committee of the Diocese of New Jersey, held in Elizabeth, on Monday, February 27, 1893, the following order of the Bishop of the Diocese in connection with the case The Vestry of Grace Church, Westfield, *versus* the Rev. J. B. Jennings, was duly considered and approved by a majority of those present, the Rev. H. H. Oberly not voting.

" The order standing on the minutes of the Committee is as follows:

" I.—The Rev. J. B. Jennings shall cease to be Rector of the Parish of Grace Church, Westfield, on March 15, 1893.

" II.—The Parish of Grace Church, Westfield, shall pay to the Rev. J. B. Jennings all arrears of salary due at that time."

Argued at November Term, 1893, before Justices Depue, Lippincott and Abbett.

For the prosecutor, *Craig Marsh.*

For the defendants, *B. F. Haywood Shreve.*

The opinion of the court was delivered by

DEPUE, J. The prosecutor, an ordained clergyman of the Protestant Episcopal Church, was, in May, 1889, canonically transferred to the diocese of New Jersey, of which the defendant John Scarborough was bishop. By a vote of the vestry of Westfield, New Jersey, adopted September 29th, 1890, he was called to the rectorship of that church, at the yearly salary of $1,000. The call was accepted, and he entered upon his duties as rector on the 22d of October, 1890.

By a canon of the Protestant Episcopal Church a rector canonically elected and in charge cannot resign his parish without the consent of the parish or its vestry, nor can such rector be removed therefrom by the parish or vestry against his will, except upon the dissolution of his pastoral connection in the manner and by the authority designated by other canons. *Dig. Canons Prot. Epis. Church U. S., canon* 4. The call of the prosecutor was without limitation as to time, and it is admitted that under such a call the tenure is for life unless terminated by mutual consent or the pastoral relation is dissolved, as provided for in the canons.

Dissensions having arisen in this church, the bishop, on the 27th of February, 1893, made an order to this effect: That (1) the Rev. J. B. Jennings shall cease to be rector of the parish of Grace Church, Westfield, on March 15th, 1893; (2) the parish of Grace Church, Westfield, shall pay to the Rev. J. B. Jennings all arrears of salary due on that date. The purport and effect of this order was to dissolve the pastoral relation of the prosecutor with his parish. Whereupon this writ of *certiorari* was sued out. The contention on behalf of the prosecutor is that the proceedings of which this order was the outcome were not in conformity with the canons of the diocese of New Jersey.

The proceedings were initiated by petition dated February 1st, 1893, and signed by all the persons who at that time were wardens and vestrymen of the church. This petition was addressed to the bishop, and asked for a dissolution of the

pastoral tie existing between the prosecutor and the parish, in accordance with title 3, canon 4, of the constitution and canons of the church.

Canon 4, title 3, so far as is material to this case, is as follows:

### "OF DIFFERENCES BETWEEN MINISTERS AND THEIR CONGREGATIONS.

"Sec. 1. Whenever there shall be any serious difference between the Rector of any Church in this Diocese and the congregation thereof, it shall be lawful for a majority of the Vestry or Trustees to make a representation to the Bishop stating the facts in the case, and agreeing for themselves and for the congregation which they represent, to submit to his decision in the matter, and to perform whatever he may require of them by any order which he may make, under the provisions of this Canon, and shall at the same time 'serve a copy of the representation on the Rector.'

"Sec. 2. It shall be the duty of the Bishop, at all stages of the proceedings, to seek to bring them to an amicable conclusion. In such a case the agreement between the parties, signed by them and attested by the Bishop, shall have the same force as an order made under Section 4 of this Canon.

"Sec. 3. If the matter shall not be amicably settled within a reasonable time, the Bishop shall convene the Standing Committee, and shall give notice to the parties to appear before them and present their proofs and arguments at such time and place as he may appoint. He may adjourn or continue the hearing of the matter at his discretion.

"Sec. 4. When the hearing is concluded, the Bishop shall make such an order in regard to the matter as he may think to be just and for the true interests of the Church; and such order may require the Rector to resign his rectorship, and may require the Church to pay a sum of money to the Rector; and it shall be the duty of the Rector, and of the Church and every member thereof, to submit to and abide by such order as the final and conclusive determination of all matters of dif-

ference between them ; *provided,* that no order shall be made under this or the next succeeding section of this Canon, unless with the advice and concurrence of at least a majority of the members of the Standing Committee, who shall have been present at the hearing.

"Sec. 5. If it shall be made to appear to the Bishop that any agreement made under Section 2 of this Canon, or any order made under Section 4 of this Canon, shall have been disregarded by any of the parties concerned, or if application be made to him to modify such order, he may convene the Standing Committee, and, after hearing such further proofs and arguments as may be presented to him, make such further order as he may think proper with the same effect as an order made under Section 4 of this Canon."

Prior to the petition of the vestry of February 1st, 1893, as early as December of the previous year charges had been made seriously affecting the moral conduct of the prosecutor, and pursuant to canon 2 of title 3, a committee of investigation was appointed by the bishop. This committee, by its report dated January 6th, 1893, reported that those charges had not been sustained. The petition of February 1st, 1893, refers to the preceding investigation, with the expression of mortification and disappointment at the result, and characterizing the prosecutor as " a priest whose worthiness rests in the fact that he has not been proven to this commission a liar and a drunkard." It also contained an allusion to the " continuation in the parish of the practices that marked the private life of the rector in other parishes." Upon the presentation of this petition the bishop, without notice or hearing the prosecutor or his proofs and without convening the standing committee, made an order dated February 4th, 1893, containing his decision that the prosecutor should cease to be the rector of this church on and after the 15th of February then next, and that the vestry of the church should pay the prosecutor all arrears of salary up to that date.

The order of February 4th, 1893, is properly referable to

the second section of the canon as an effort to obtain an amicable conclusion of the controversy between the parties. The order with a copy of the petition was transmitted by the bishop to the prosecutor. It was not acceded to by the prosecutor. In his letter to the bishop of February 10th, 1893, he said : "I am very sorry. I would like to obey your order to resign my parish, but I cannot possibly do so under the circumstances. It would place a stigma upon my life and ministry. * * * If my case must go to the standing committee, let us have it done in accordance with the canon. Pardon me, my dear bishop, for saying I do not think your order for my resignation is in accordance with canon 4, title 3, section 4."

The bishop's order of February 4th not having resulted in an agreement between the parties, the procedure to dissolve the pastoral relation *in invito* should have been under sections 3 and 4 of the canon, and not under section 5. There is a distinction of great importance between the procedure prescribed by section 3 and proceedings under section 5. By section 3 the standing committee shall be convened and notice given to the parties to appear before them and present their proofs and arguments, and by the proviso in section 4 no order that may be made is valid unless with the advice and concurrence of the majority of the members of the standing committee, who shall have been present at the hearing. These sections constitute a tribunal consisting of the bishop and the standing committee for the hearing of proofs and arguments presented before it. After such hearing is concluded the bishop may make such an order in regard to the matter as he may think to be just and for the true interests of the church, provided the same receives the concurrence of a majority of the members of the standing committee present at the hearing.

Section 5 provides for the contingency of an agreement between the parties made under the second section of the canon, or of an order made under section 4 having been disregarded, or of an application being made to the bishop to modify such order. In either of these events the standing

committee may be convened and a rehearing be had upon further proofs and arguments. The proceeding under section 5 is by way of appeal from an order made under some one of the preceding sections, and it seems from the language of the section that the convening of the standing committee for that purpose as well as the hearing of further proofs are matters discretionary.

Where the dissolution of the pastoral relation cannot be effected by amicable arrangement through the good offices of the bishop, the only method of obtaining that result provided for by the canons of the diocese is by proceedings initiated under section 3 and conducted in conformity with the third and fourth sections.

The order made by the bishop in this case for convening the standing committee in express terms notified that body to convene on Monday, the 27th of February, at eleven A. M., at the guild-rooms of Christ Church, Elizabeth, under the provisions of title 3, canon 4, section 5, to consider the differences between the vestry of Grace Church and the prosecutor. The notice to the vestry and also to the prosecutor stated that the standing committee had been summoned according to the provisions of section 5. These notices did not conform to the requirement of section 3. They gave notice to the parties to appear before the standing committee at the time and place named, but did not notify them to present their proofs and arguments at the time and place appointed. The paper presented by the vestry to the standing committee treats the proceeding as by way of appeal, under section 5, from the bishop's order of February 4th, and not in fact as a hearing under section 3.

The same observation will apply to the action of the standing committee. When the members came together at Elizabeth they organized in the study of Christ Church, and, as testified by the secretary, "proceeded to formulate the principles which would guide them in the hearing," and then went to the guild-room, where the parties were, and the secretary read "the rules of proceeding." On cross-examination the

same witness testified that the committee had determined that there should be no argument, no counsel—nothing but a statement of facts by the representatives of the vestry and Mr. Jennings; that the hearing should be limited to hearing those two parties. The minute certified in the return to this writ is to the same effect. It is in these words: "On motion, it was resolved that the committee, with the bishop, hear a statement of the case of The Vestry of Grace Church, Westfield, v. The Rev. J. B. Jennings, by the representatives of the parish and also by the Rev. J. B. Jennings, without counsel or argument." The minute further states that the statement of the vestry was read, after which the Rev. Mr. Jennings made his statement and argument. The committee retired to the rectory for deliberation with the bishop. After deliberation the bishop stated that his order was—(which is the order under review), and that the concurrence of the standing committee was given to the order. In the depositions taken under a rule of this court it appears that the prosecutor had witnesses present ready to testify in his behalf, and there is the affirmative testimony of witnesses whose integrity we are not at liberty to impugn, that the prosecutor took exception to the fact that he was not permitted to have witnesses, and asked an adjournment to enable him to consult counsel and prepare his case. We think that the prosecutor was not entitled to be represented by counsel at the hearing, but that he was entitled as of right to a hearing upon proofs presented before the committee, pursuant to sections 3 and 4 of the canon, especially as the result of the deliberations of that tribunal might deprive him of property rights which, under the general canons of the church, enured to him in virtue of his rectorship. We also think, although there is some conflict of testimony on the subject, the fair result of the evidence is that the prosecutor did not deprive himself of the right to such a hearing by waiver or acquiescence. The order under review, although it purports on its face to have been made under sections 3 and 4, was, for the reasons above given, irregular. The standing committee was convened under sec-

tion 5; the notice to the prosecutor of the sitting of the committee stated that it was convened under that section; it contained no notice that he should produce his proofs before them as prescribed by section 3, and the rules of procedure adopted by the committee for the hearing excluded proofs other than the statement of the case by the parties respectively, and the prosecutor was neither permitted to call witnesses nor to have an adjournment to enable him to prepare his case.

On behalf of the defendants, the contention is that the subject-matter of the controversy is not cognizable in a court of law.

The act under which Grace Church was incorporated constituted the wardens and vestrymen trustees, to whom is committed the control and management of the temporalities of the church. *Rev., p.* 962, 963; *Livingston* v. *Trinity Church,* 16 *Vroom* 230.

The call by the vestry and the acceptance by the prosecutor created a contract for the payment of the stipulated salary so long as the pastoral relation subsisted. This contract is a civil right which the courts will protect and enforce. *Worrell* v. *First Presbyterian Church,* 8 *C. E. Gr.* 96; *Miller* v. *Baptist Church,* 1 *Harr.* 251, 254; *Van Vlieden* v. *Welles,* 6 *Johns.* 85. Under the ecclesiastical law which regulates the temporal affairs of the Episcopal Church, a rector called and duly instituted also has rights in the church edifice, for the invasion or disturbance of which by the wardens and vestrymen a suit at law will lie. *Lynd* v. *Menzies,* 4 *Vroom* 162, 167, 168. These contractual and property rights are vested in a rector so long as the rectorship continues, and, by the canon already referred to, that relation can be terminated only by mutual consent, or by dissolution in the manner provided for in the canons.

By the canons of the diocese of New Jersey a special tribunal is established, consisting of the bishop and the standing committee, to which is committed jurisdiction to dissolve the pastoral relation between a rector and his parish, and the

course of procedure by which the jurisdiction conferred shall be exercised is prescribed. The order under review purports to dissolve the pastoral relation of the prosecutor and the parish from the date named therein, and if valid its legal effect would be to put an end to the legal rights that were vested in the prosecutor as rector.

Courts of law will not interpose to control the proceedings of ecclesiastical bodies in spiritual matters which do not affect the civil rights of individuals, nor will they interfere with the action of the constituted authorities of religious societies in matters purely discretionary. *Livingston* v. *Trinity Church,* 16 *Vroom* 230. But where, as in the present case, the civil rights of an individual are involved, jurisdiction is committed to the courts of law to protect those rights which the court cannot discard. The cases in which courts of law have entertained actions for salary and for disturbance of the rights of a rector in the church edifice by the trustees of the church, and the numerous cases in which the courts, by *mandamus* and *certiorari,* have intervened to protect the civil rights of members of voluntary associations, are precedents fully establishing the jurisdiction of the civil courts where civil rights are involved. In Den *v.* Bolton the court considered and adjudicated upon the jurisdiction of the classis of the Dutch Reformed Church to depose one of its ministers from the ministry, and having found jurisdiction to that end in the rules for the government of the church, the court declined to consider the manner in which that jurisdiction had been exercised in that case, on two grounds—(1) that no rules of procedure were prescribed in the constitution of the church, and, as was said by the Chief Justice, "of course it is subject to the discretion of the classis;" and (2) that the remedy of the party aggrieved was by appeal to a higher tribunal of the church. 7 *Halst.* 206, 220. As already appears, the course of procedure for dissolving the pastoral relation of the rector with his parish is, by the canons of the Episcopal Church, specially prescribed. An order dissolving that relation, not made in conformity with the canons, is *coram non judice.* Nor is

there, by the law of the Episcopal Church, another tribunal to which an appeal may be made.

The writ of *certiorari* in this case was properly allowed. How far the court will go in review of the proceedings under consideration, is another question. Section 4 of the canon provides that when the hearing is concluded, "the bishop shall make such order in regard to the matter as he may think to be just and for the true interests of the church," and it is made the duty of the rector and of the church and every member thereof to submit to and abide by such order, provided it be made with the concurrence of a majority of the members of the standing committee, who shall have been present at the hearing. With respect to the judgment that shall be pronounced by the bishop with the concurrence of the committee, after a hearing, the authority of the bishop is discretionary and supreme. The prosecutor, as an ordained minister of the church, is subject to the laws of the church and to its constituted authorities, but at the same time he is entitled to a hearing in compliance with the laws of the church before judgment is pronounced.

The proceedings on which the order in question was made were not in compliance with the canons of the church, and for this reason the order should be set aside.