JAMES CHAVIS AND OPHELIA CHAVIS, PLAINTIFFS-RESPON-
DENTS AND CROSS-APPELLANTS, v. WILLIE C. NICKERSON,
ROBERT ALEXANDER, JAMES BURWELL, LEROY COLE-
MAN, THOMAS CRAWFORD, SIMMIE PIPKIN, ELLSWORTH
POWELL, PERCY SCHOFIELD, CHARLES WILLIAMS AND
SEYMOUR LYEW, DEFENDANTS-APPELLANTS AND CROSS-
RESPONDENTS, AND ALBERT P. ROWE, DEFENDANT AND
CROSS-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 4, 1981—Decided March 16, 1982.

Before Judges FRITZ, ARD and TRAUTWEIN.

*Elwyn Saviet* argued the cause for appellants and cross-respondents (*Gelman & Gelman,* attorneys; *Elwyn Saviet* and *Barry A. Cohen* on the brief).

*Richard P. Weitzman* argued the cause for respondents and cross-appellants (*Weitzman, Brady & Weitzman,* attorneys).

PER CURIAM.

The essence of this appeal centers about the defrocking of plaintiff James Chavis as a deacon of the Calvary Baptist Church. The thrust of plaintiffs' contentions is, in a word, that since Chavis was elected to his deaconship by the membership, the bylaws could not be read so as to permit the deacons to unseat him, and that even were the bylaws not to be interpreted in this fashion, the action of the deacons was for the wrong reason. It is apparent and not contradicted that Chavis had been critical of the pastor.

Plaintiffs originally brought this action in the Chancery Division against the pastor and other deacons who participated in the church action, seeking a mandatory injunction against defendants from interfering with the exercise by Chavis of the duties of a deacon and, in addition, seeking damages. The Chancery Division judge denied the affirmative relief and transferred the matter to the Law Division for trial. The subsequent jury trial resulted in the awarding of damages to plaintiffs. This verdict was set aside by the trial judge and a new trial was ordered limited to compensatory damages only (with minor modifications respecting plaintiff Ophelia Chavis and certain defendants, not significant here). A second jury trial also

resulted in an award for damages, substantially less than the prior award. Following this, the trial judge denied a motion for new trial or *remittitur* and granted a motion for suspension of prejudgment interest. Defendants appealed from the adverse judgment and plaintiffs cross-appealed from the order for new trial, from the exclusion of punitive damages from the case, from the exclusion of consideration for certain incidental damages, from the involuntary dismissal of their cause of action against the pastor and from the order of suspension of prejudgment interest. We are satisfied that in the circumstances of this case, the court should not have exercised jurisdiction over this matter, and we direct the entry of judgment for defendants.

█ Imposition upon the courts of the regulation of church matters is frequently discussed in terms of the presence or absence of jurisdiction. This approach inclines toward some confusion because prior precedent is distinguished rather than overruled in *Baugh v. Thomas,* 56 *N.J.* 203 (1970), where it is said (at 207) that "earlier cases which held that the courts lack jurisdiction over spiritual matters and the administration of church affairs which do not affect the civil or property rights of individuals" were correct, but this rule of the absence of jurisdiction does not apply "where a member is expelled from" the spiritual organization. (At 208.) We need not here stumble over the knotty problem of determining whether the circumstances of this case concern the administration of church affairs (which would seem so) to an extent constituting such "a serious emotional deprivation" that it might invest jurisdiction where there be none under the limited acceptance in *Baugh* of the earlier cases, because, in our judgment the particular circumstances of this case present a seemingly irresistible middle ground to fill the space between *Baugh* and its predecessors: even if jurisdiction is present, it ought not be exercised. We observe at the same time, not as a motivation for such a result but as a "fringe benefit" thereof, that such a determination saves the necessity for deciding whether judicial interference in the circumstances before us constitutes a First Amendment (to

the *U.S.Const.*) intrusion. See, *e.g., Serbian Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 96 *S.Ct.* 2372, 49 *L.Ed.2d* 151 (1976). Nor do we worry about wrongful disregard for *Baugh.* That matter involved an expulsion from church membership. No such circumstances are present here where, while plaintiffs understandably claim considerable embarrassment and emotional distress, they were expressly permitted to continue their worship at the organization of their choice and in its church. The relatively simple question presented and the problem which has arisen is simply a case of the administration of a church affair respecting what body may disenfranchise from the position a deacon elected by the membership.

In our decision we are moved in part by the wisdom of an ancient precedent in the Supreme Court of the United States, undisturbed over the years by the ebb and flow of various philosophies in that tribunal, *Watson v. Jones,* 80 *U.S.* (13 *Wall.*) 679, 20 *L.Ed.* 666 (1872). There it was first acknowledged that "Religious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." 80 *U.S.* (13 *Wall.*) at 714. At the same time that case adjured:

> In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them.
>
> .  .  .  .  .  .  .  .
>
> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted

questions of faith within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for. [80 *U.S.* at 727–729]

■ *Watson* and its progeny have determined, and our court of last resort has concurred, that although a civil court may inquire into such things as fraud, collusion or arbitrariness in an ecclesiastical disposition, or undertake and properly resolve a church property dispute by the incidental application of "an ecclesiastical determination," ecclesiastical doctrinal controversies have no place in that courtroom. *Protestant Episc. Church v. Graves*, 83 *N.J.* 572, 576 (1980), *cert.* den. 449 *U.S.* 1131, 101 *S.Ct.* 954, 67 *L.Ed.*2d 119 (1981). *Accord, Diocese of Newark v. Burns*, 83 *N.J.* 594 (1980), *cert.* den. 449 *U.S.* 1131, 101 *S.Ct.* 954, 67 *L.Ed.*2d 119 (1981).

■ With these principles in mind we take this opportunity to say that in our judgment our courts are too frequently asked to referee matters which might more appropriately be finally determined somewhere else. We realize that one of the great strengths of our system of government is to be found in the accessibility of the courts, and a closing of those doors should be exercised by the judiciary only most carefully and circumspectly and only in matters where there appears to be no reason for judicial intrusion. Notwithstanding, the right to refuse the exercise of jurisdiction undoubtedly reposes in the residual equitable powers with which the Superior Court is clothed. *N.J. Const.* (1947), Art. VI, § III, par. 4. While we could not reasonably attribute kinship between governmental administrative agencies and ecclesiastical organizations, we cannot wholly disregard the logical persuasion of the principles of comity and deference of substantial significance in such matters as *Hinfey v. Matawan Regional Bd. of Ed.*, 77 *N.J.* 514 (1978).

We iterate the wisdom of Justice Clifford in his concurring opinion in *Oakwood at Madison, Inc. v. Madison Tp.*, 72 *N.J.* 481, 631 (1977):

> ... What I seek to emphasize is this: society has yet to achieve agreement on the basic question of what it is our courts are expected to do; as a result of this uncertainty we may be accepting litigational burdens which, according to one commentator, are beyond the institutional capacity of the tribunals and the "cranial capacity" of the judges. This, from former Judge Simon H. Rifkind, who points out in his penetrating article, "Are We Asking Too Much of Our Courts?," 15 *Judges' J.* 43 (1976) ... that the judiciary has increasingly been solicited to become the problem-solver of our society, sort of its all-around handyman.
>
> . . . .
>
> The thrust of the Rifkind essay is that courts, being institutions of last resort, should be required to do nothing which other, less irreplaceable institutions can do as well, and should be preserved for doing that which cannot be done elsewhere. [at 633]

We remand for the entry of judgment for defendants. No costs.