JAMES CHAVIS AND OPHELIA CHAVIS, PLAINTIFFS-APPEL-LANTS, v. ALBERT P. ROWE, WILLIE C. NICKERSON, ROB-ERT ALEXANDER, JAMES BURWELL, LEROY COLEMAN, THOMAS CRAWFORD, SIMMIE PIPKIN, ELLSWORTH POW-ELL, PERCY SCHOFIELD, CHARLES WILLIAMS AND SEYM-OUR LYEW, DEFENDANTS-RESPONDENTS.

Argued December 6, 1982—Decided May 10, 1983.

*Richard P. Weitzman* argued the cause for appellants (*Weitzman, Brady & Weitzman,* attorneys; *Richard P. Weitzman* and *Robert M. Rich,* on the brief).

*Elwyn Saviet* argued the cause for respondents (*Gelman & Gelman,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

In 1973 the members of Calvary Baptist Church of Paterson, New Jersey, elected plaintiff James Chavis as a deacon. In 1977 the Board of Deacons (Board) removed Chavis from his post as deacon, or "defrocked" him, apparently because he had fallen into disfavor with the pastor, defendant Alfred P. Rowe. Chavis and his wife, plaintiff Ophelia Chavis, instituted this action for injunctive relief and damages against the pastor and other deacons who had participated in the church action, claiming that the Board had ignored the correct procedures for removal. The Chancery Division denied an injunction and transferred the damage claim to the Law Division, where a trial produced a jury verdict in plaintiffs' favor. The Appellate Division reversed, *Chavis v. Nickerson,* 183 *N.J.Super.* 458 (1982). Plaintiffs ap-

peal, asserting a substantial constitutional question, *R.* 2:2–1(a).[1]
We affirm, and hold that because resolution of plaintiffs' claims
would require an excursion into matters of church doctrine and
polity, the civil courts lack jurisdiction to entertain this case.

I

The Calvary Baptist Church is congregational. Unlike hierar-
chical churches, which are characterized by a "common ruling
convocation or ecclesiastical head", *Kedroff v. Saint Nicholas
Cathedral,* 344 *U.S.* 94, 110, 73 *S.Ct.* 143, 151, 97 *L.Ed.* 120, 133
(1952), a congregational denomination comprises autonomous
local bodies. *Protestant Episcopal Church v. Graves,* 83 *N.J.*
572, 577 (1980), *cert. den. sub. nom. Moore v. Protestant
Episcopal Church,* 449 *U.S.* 1131, 101 *S.Ct.* 954, 67 *L.Ed.2d* 119
(1981). Baptist churches traditionally have been characterized as
congregational. See *Baugh v. Thomas,* 56 *N.J.* 203 (1970);
*Moorman v. Goodman,* 59 *N.J.Super.* 181 (App.Div.1960). The
constitution of Calvary, consistent with congregational organiza-
tion, vests governing power in the membership and allows the
membership to approve any affiliation or cooperation with other
associations or conventions.

In addition to its constitution Calvary enacted by-laws that
outline, among other things, disciplinary procedures. As plain-
tiffs admit, however, neither the constitution nor the by-laws
spell out the procedure for removing an officer in the middle of
his term. Article 3 of the by-laws empowers the deacons to
"consider all matters of grievance and discipline within the
church," and Article 10, section 1 directs that "[a]ll matters of
discipline shall be under the jurisdiction of the Deacons and the

---

[1]The safer, and preferred, course would have been to accompany the notice
of appeal with a petition for certification. *See Deerfield Estates, Inc. v.
Township of E. Brunswick,* 60 *N.J.* 115, 120 (1972). We need not, however,
become distracted by the question of whether the asserted constitutional
issue is a "substantial" one within the meaning of the rule, for had a petition
for certification been presented, we would in all likelihood have granted it to
consider the question of general public importance raised here.

pastor." Unlike the procedure for expulsion, which is set forth in Article 10, section 4 of the by-laws (written notice and a hearing before the Board), removal from office receives no mention in either the constitution or the by-laws, suggesting that removal, if permitted at all, must be effected in a manner that the Board, in its discretion, chooses.

The appropriate removal procedure becomes less clear with Article 10, section 3, which directs the deacons and the pastor to present matters of "unusual" difficulty that arise between members to the church itself for "whatever disciplinary action the church may deem advisable." Finally, Article 10, section 2 provides that "[i]n private offenses, Matthew 18:15–17 shall be followed and the *Baptist Manual of Polity & Practice* by Maring & Hudson and the *Hiscox Manual* used as official reference." A "private offense" refers to injury done or claimed to have been done by one member to another. The *Hiscox Standard Baptist Manual* at 133 requires that such offenses be resolved ultimately by reference to the Bible, specifically *Matthew* 18:15–17. That passage instructs the offended one to tell of the offense "unto the church," which *Hiscox* interprets to require a full and fair hearing before the church members. In short, the correct removal procedure, if there is one, does not appear on the face of the relevant church documents.

Not only do the parties disagree over what procedures should have been followed, but they also disagree over what procedures were in fact followed. In April 1977, the Board sent Chavis a letter requesting his resignation. Chavis brought this letter to the congregation's attention at the quarterly meeting held on April 7, 1977. According to Pastor Rowe, the members at that meeting delegated to the Board the power to resolve the matter. Plaintiffs challenge the delegation, pointing out that the members never formally voted on sending the matter to the Board. On May 1, the Board sent Chavis a letter telling him that it had voted unanimously to expel him from deaconship. The church membership was informed of this action at the July quarterly meeting when the minutes of the April meeting were read.

According to defendants, the members at the July meeting ratified the delegation of authority that allegedly had been made at the April meeting, although plaintiffs sharply dispute that contention.

Plaintiffs, rather than foundering in the confusion generated by the seemingly contradictory by-laws, claim the very lack of specific removal procedures supports their position that a deacon may be removed only by those who elected him, namely, the members. The trial court agreed with plaintiffs that the Board lacked the authority to defrock and instructed the jury to award damages if it found that plaintiffs had been injured as a proximate result of the removal. The jury awarded James Chavis $14,001 and Ophelia Chavis $14,000. The trial court accepted the finding of liability but ordered a new trial limited to the issue of damages, which resulted in awards of $6,000 to Mr. Chavis and $2000 to his wife. On defendants' appeal and plaintiffs' cross-appeal the Appellate Division ruled that the trial court's jurisdiction over the matter, even if present, should not have been exercised. 183 *N.J.Super.* at 460. The court below therefore remanded the cause to the trial court for entry there of judgment for defendants. *Id.* at 463.

## II

The following oft-quoted passage from *Watson v. Jones,* 13 Wall. 679, 20 *L.Ed.* 666 (1872), recognizes that the First Amendment circumscribes the role of civil courts in church disputes:

In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious

bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed. [*Id.* at 728–29, 20 *L.Ed.* at 676–77.]

*Watson* held that in resolving property disputes within a hierarchical church, civil courts must defer to the highest church authority that has ruled on the matter, unless the express terms in the instrument by which the property is held condition the property's use or control in a specified manner. See *Maryland & Virginia Eldership v. Church of God at Sharpsburg,* 396 *U.S.* 367, 368–69, 90 *S.Ct.* 499, 500–501, 24 *L.Ed.2d* 582, 583–84 (1970) (Brennan, J., concurring). If the church is congregational, *Watson* requires that civil courts enforce the property decisions made by a majority of its members or by any other governing body it may have instituted.

*Watson* is not the only approach to church disputes. In *Presbyterian Church v. Hull Church,* 393 *U.S.* 440, 449, 89 *S.Ct.* 601, 606, 21 *L.Ed.2d* 658, 665 (1969), the Supreme Court approved the application of "neutral principles of law, developed for use in all property disputes," for resolving litigation over church property. That approach calls for the secular examination of church deeds, constitutions, by-laws, canons and the like for settling church disputes, thereby freeing "civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf,* 443 *U.S.* 595, 603, 99 *S.Ct.* 3020, 3025, 61 *L.Ed.2d* 775, 785 (1979). However, "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues." *Maryland & Virginia Eldership, supra,* 397 *U.S.* at 370, 90 *S.Ct.* at 501, 24 *L.Ed.2d* at 585 (Brennan, J., concurring).

In *Hull Church, supra,* two local Georgia churches within a hierarchical denomination voted to withdraw from the general church on the ground that the general church had departed from the doctrine and practice of the denomination at the time of affiliation. The general church stepped in to take over the local churches' property until new local leadership could be appointed. The Supreme Court noted that because Georgia law implied a trust of local church property in favor of the general church on

the sole condition that the general church adhere to its tenets of faith and practice, a civil court would be required to ask what those tenets were and how far the general church had strayed from them.  The Court found this entanglement with religious doctrine impermissible, but did acknowledge that a civil court could in certain cases settle the controversy by applying neutral principles of property law.

In *Jones,* a schism in a local church affiliated with a hierarchical organization led to conflicting claims as to which faction of the local church owned the church property.  At a meeting attended by a quorum of members, 164 voted to leave the general church and take the property with them, and 94 voted to remain loyal.  A commission appointed by the general church found that the minority represented the "true congregation."  When representatives of the minority faction brought a class action in a Georgia state court to establish their right to exclusive use and possession of the church property, the trial court, purporting to apply Georgia's neutral principles of law to the resolution of the property dispute, held in favor of the majority.  The Supreme Court held that a state is constitutionally entitled to adopt the neutral-principles-of-law approach in resolving church disputes; and if it could be shown that Georgia "had adopted a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, * * * this would be consistent with both the neutral principles analysis and the First Amendment."  *Id.* 443 U.S. at 607, 99 *S.Ct.* at 3027, 61 *L.Ed.*2d at 787.

New Jersey cases have long held that civil courts lack jurisdiction over spiritual matters and the administration of church affairs that do not affect the civil or property rights of individuals.  *Moorman v. Goodman, supra,* 59 *N.J.Super.* at 186, *Jennings v. Scarborough,* 56 *N.J.L.* 401 (Sup.Ct.1894).  Tempo-

ral matters of a church affecting civil or property rights, on the other hand, may be resolved by civil courts, which will use either the *Watson* or the "neutral principles" approach, depending on the church structure. Justice Sullivan wrote in *Protestant Episcopal Church v. Graves, supra,* 83 *N.J.* at 580, that New Jersey courts are to use neutral principles in adjudicating property disputes within a congregational church.

■ At the threshold of the "neutral principles" approach lies the requirement of a judicially-protectible interest. Whereas *Hull Church* and *Jones* involved disputes over church property, this case concerns the loss of an unsalaried deaconship, a loss that *Everett v. First Baptist Church of Sussex,* 6 *N.J.Misc.* 640 (Sup.Ct.1928) (overruled on other grounds), implied might not involve civil or property rights. On the other hand, *Baugh v. Thomas, supra,* held that membership in a church would be judicially protected from unjust interference because the "loss of the opportunity to worship in familiar surroundings is a valuable right which deserves the protection of the law." 56 *N.J.* at 208. Similarly, *Higgins v. American Soc'y of Clinical Pathologists,* 51 *N.J.* 191 (1968), held that the status and professional recognition conferred by membership in a clinical pathology society would warrant judicial inquiry into the reason for expulsion.

Although Chavis undoubtedly lost status within the church, he did not lose the right to worship at Calvary and there is no indication that the defrocking affected his business life. However, we need not decide whether Chavis's status as a deacon is a judicially-protectible interest, for even if that be the case, the fact remains that judicial inquiry into the propriety of the removal procedures followed would intrude impermissibly on matters of church doctrine and polity. Justice Brennan, concurring in *Maryland & Virginia Eldership, supra,* wrote that

courts do not inquire whether the relevant church governing body has power under religious law to control the property in question. Such a determination,

unlike the identification of the governing body, frequently necessitates the interpretation of ambiguous religious law and usage. To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy. [396 *U.S.* at 369–70, 90 *S.Ct.* at 500–501, 24 *L.Ed.2d* at 584 (footnote omitted).]

In the present case it is not at all clear who had the power to remove a deacon. That *Baugh* would permit a court to examine whether the "*established* procedures of a religious organization, *as proved,* have been followed," 56 *N.J.* at 208 (emphasis added), does not suggest that a civil court may dissect the constitution and by-laws of Calvary or the religious writings of the Baptist Church to find whether removal is a disciplinary procedure "under the jurisdiction of the deacons" (by-laws, Article 10, section 1); or whether the deacons' power to "consider all matters of grievance and discipline within the church" (Article 2(d)) includes the power to strip a deacon of his post; or whether the Board must adhere unswervingly to the Biblical explications offered by the *Hiscox Standard Baptist Manual* when the manual is used as an "official reference" in private offenses (Article 10, section 2); or whether Chavis's case presents "unusual difficulty" that should be presented to the congregation (Article 10, section 3); or, if defrocking is a power of the congregation, whether the members' authority to urge "whatever disciplinary action [it] may deem advisable" (Article 10, section 3) includes the power to delegate jurisdiction over the matter to the Board of Deacons; or, if such delegation is permitted, whether it need be unanimous; or whether (and if so, how) the members may ratify the removal or the delegation.

In *Baugh,* this Court admonished a church to follow an established procedure relating to a ministerial process (tallying votes), whereas in this case plaintiffs would have us perform a

task better left to exegetes. The procedure for removing a deacon is ambiguous. That ambiguity would be properly resolved only by going beyond the by-laws and the constitution of Calvary to a study of the purpose and the philosophy of congregational structure in general and of disciplining congregational deacons in particular. Perhaps this would require scrutiny of the Biblical injunctions to "gain a brother" (*Matthew* 18:15), or to forgive trespassers (*Luke* 17:3), identified by *Hiscox* as the goal and the spirit of discipline. Such hermeneutics are beyond this Court's realm.

Moreover, insinuation by civil courts into the customs and usages of the by-laws and the constitution, into the administration and the polity of the church in the hope of uncovering clues to the correct disciplinary procedures, threatens the freedom of religious institutions from secular entanglement.

First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interest in matters of purely ecclesiastical concern. * * * [T]he Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. [*Hull Church, supra,* 343 *U.S.* at 449, 89 *S.Ct.* at 606, 21 *L.Ed.2d* at 665.]

### III

The judgment of the Appellate Division is affirmed and the cause remanded to the Law Division for entry there of judgment for defendants. No costs.

For affirmance—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For reversal*—none.