**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0387-18T1

ISLAMIC CENTER
OF PASSAIC, INC.,

     Plaintiff-Respondent,

v.

ZAKIYYAH SALAHUDDIN,

     Defendant-Appellant.

_____

     Submitted November 7, 2019 – Decided January 13, 2020

     Before Judges Suter and DeAlmeida.

     On appeal from the Superior Court of New Jersey, Chancery Division, Passaic County, Docket No. C-000125-16.

     Gregory Guy Johnson, attorney for appellant.

     Victor Manuel Urbaez, attorney for respondent.

PER CURIAM

     Defendant Zakiyyah Salahuddin appeals from the August 21, 2018 judgment of the Chancery Division upholding her removal as finance director

and member of the governing body of plaintiff Islamic Center of Passaic, Inc. (Islamic Center). We affirm.

I.

The following facts are derived from the record. In 1988, Salahuddin's husband, Imam Ameer Pasha Salahuddin (Imam Pasha), founded Islamic Center, a non-profit religious corporation. Imam Pasha served for decades as the organization's spiritual and administrative leader. Islamic Center did not have a written constitution or bylaws, giving Imam Pasha sole discretion and control over Islamic Center's operations.

In 1990, Islamic Center purchased a building in Paterson. A deed memorializing the transfer states the property owner is Islamic Center. The first floor houses commercial tenants, and the remainder of the property serves as a place of worship and meeting space for Islamic Center's adherents. The rent collected on the commercial space is the primary source of income for Islamic Center.

It is undisputed Salahuddin played an integral role in the development and operation of Islamic Center. Her contribution to the growth of the organization and its charitable works in the community is well established in the record. She served for decades as the finance director of Islamic Center. In that capacity,

2

Salahuddin oversaw the collection of rents and member offerings, maintained the organization's bank accounts, paid its bills, and tended to other financial responsibilities.

Imam Pasha died in 2013. Salahuddin was under the mistaken impression she inherited Islamic Center and its property from her husband. She also appears to have believed she was vested with sole control of Islamic Center.

Imam Rashad Aziz Muhammad (Imam Rashad) was appointed the spiritual leader of Islamic Center after Imam Pasha's death. He began working with Islamic Center's members to establish a governing structure for the organization. In November 2015, after six months of discussion, a constitution and bylaws relating to the governance of Islamic Center were ratified by the membership. Salahuddin, who signed the ratified constitution, was appointed finance director and member of Islamic Center's governing body, the Shura Board.

In 2016, Imam Quddoos Farra'd (Imam Farra'd) became the spiritual leader of Islamic Center. He and Salahuddin soon clashed over operation of Islamic Center. In particular, Salahuddin resisted attempts by Iman Farra'd and the Shura Board to oversee her financial activities on behalf of the organization.

A-0387-18T1

For example, Salahuddin refused to list Imam Farra'd as an authorized signer on Islamic Center's financial accounts. She denied access to Islamic Center's financial records, including the organization's tax returns, by taking them to her home. Salahuddin also refused to follow Shura Board directives by failing to submit an annual report, accounting, and updates on Islamic Center's financial holdings.

In addition, after Islamic Center's financial accounts were frozen, Salahuddin collected rents from the commercial tenants and opened a new bank account in the name of Islamic Center. Salahuddin made herself an authorized user of the account. Although there is no evidence Salahuddin misused the funds in the new account, she acted without the approval of the Shura Board and caused Islamic Center to pay bank fees.

Salahuddin also acted on her mistaken belief she owned Islamic Center's property. She twice arranged, without approval of the Shura Board or notice to Imam Farra'd, for the locks on Islamic Center's building to be changed. By doing so, she prevented Imam Farra'd from accessing the building and blocked members of Islamic Center from worshipping at daily services. Salahuddin's actions required police intervention to permit Imam Farra'd and members of Islamic Center to regain access to the building.

4

Imam Farra'd attempted to resolve the organization's differences with Salahuddin through various informal means, including telephone calls, home visits, and religion-based conflict resolution. Ultimately, Imam Farra'd initiated proceedings to remove Salahuddin as finance director and member of the Shura Board. He attempted to provide Salahuddin with notice of the place, date, and time of the removal proceedings. Although Salahuddin claims not to have received notice of the proceedings, she attended both Shura Board sessions at which her removal was considered. She refused to participate and walked out of both meetings before they were finished. The Shura Board eventually voted to remove Salahuddin from office. Islamic Center's membership thereafter ratified the Shura Board's decision.

On or about September 21, 2017, Islamic Center filed an amended complaint in the Chancery Division seeking a judgment declaring Salahuddin had been legally removed as finance director and member of the Shura Board. In addition, Islamic Center sought an order directing Salahuddin to return all Islamic Center funds and property in her possession.

Salahuddin filed a counterclaim alleging the funds in Islamic Center's bank accounts belong to her and that Islamic Center, Imam Farra'd, and Valley

National Bank (VNB) conspired to deprive her of access to her property. She sought $36,000 in damages for what she alleges is a conversion of her property.[1]

The matter was tried over three days without a jury. On August 21, 2018, Judge Thomas J. LaConte issued a written opinion concluding Salahuddin was legally removed as finance director and member of the Shura Board. The judge, who weighed the credibility of the witnesses, found Salahuddin received adequate notice of the removal proceedings and her removal from office was carried out in accordance with Islamic Center's constitution and bylaws.

On August 21, 2018, the court entered a final judgment validating Salahuddin's removal as finance director and member of the Shura Board and ordering Salahuddin to relinquish all records, documents, and property of Islamic Center in her possession, as well as to effectuate the removal of her name from all Islamic Center financial accounts.[2]

---

[1] Although Salahuddin sought an award of damages against Imam Farra'd and VNB, she did not name those parties as counterclaim defendants.

[2] The August 21, 2018 final judgment does not mention Salahuddin's counterclaim. However, given that the counterclaim is based on Salahuddin's allegation she owns the funds in Islamic Center's financial accounts, it is apparent the trial court concluded Salahuddin is not entitled to relief on her counterclaim.

A-0387-18T1

This appeal followed. Salahuddin raises the following arguments for our consideration:

POINT I

THE REMOVAL OF APPELLANT FROM THE BOARD AND AS A TRUSTEE OF THE ISLAMIC CENTER WAS IMPROPER AND CONTRADICTORY TO THE ISLAMIC CENTER BYLAWS.

POINT II

THE TRIAL COURT ERRED BY REMOVING APPELLANT FROM THE FOURTH WARD CDC AND SADAQA, INC., INDEPENDENT AND SEPARATE ENTITIES.

II.

Although not raised by the parties, we begin our analysis with our conclusion there is no constitutional impediment to judicial resolution of the parties' claims. "[T]he Religion Clauses of the First Amendment, applicable to the states through the Fourteenth Amendment, forbid laws 'respecting [an] establishment of religion, or prohibiting the free exercise thereof . . . .'" McKelvey v. Pierce, 173 N.J. 26, 39 (2002) (quoting U.S. Const. amend. I)). The "free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires[,]" Employment Div. v. Smith, 494 U.S. 872, 877 (1990), with the Free Exercise Clause providing "institutional

7

protection by forbidding governmental action from encroaching on the ability of a church to manage its internal affairs." McKelvey, 173 N.J. at 40 (internal quotations omitted). The Establishment Clause "prohibits states from promoting religion or becoming too entangled in religious affairs, such as by enforcing religious law or resolving religious disputes." Id. at 40 (citing Cty. of Allegheny v. Am. Civil Liberties Union, 492 U.S. 573, 590-91 (1989); Ran-Dav's Cty. Kosher, Inc. v. State, 129 N.J. 141, 158 (1992), cert. denied sub nom., Nat'l Jewish Comm'n on Law & Public Affairs v. Ran-Dav's Cty. Kosher, Inc., 507 U.S. 952 (1993)).

A church's freedom to regulate its internal affairs "has . . . been described as being rooted in both of the Religion Clauses . . . ." McKelvey, 173 N.J. at 44. "Thus, the threshold inquiry is whether the underlying dispute is a secular one, capable of review by a civil court, or an ecclesiastical one about discipline, faith, internal organization, or ecclesiastical rule, custom or law." Id. at 45 (quotation omitted). A court may not resolve "church property disputes on the basis of religious doctrine and practice[,]" Jones v. Wolf, 443 U.S. 595, 602 (1979), but may "interpret provisions in religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in purely secular terms." McKelvey, 173 N.J. at 51-52 (citing Minker v. Balt.

Annual Conference of United Methodist Church, 894 F.2d 1354, 1358 (D.C. Cir. 1990)).

"If . . . the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion . . . , there is no First Amendment shield to litigation." Id. at 52. "Thus, courts can and do decide secular legal questions in cases involving some background issues of religious doctrine, so long as the courts do not intrude into the determination of the doctrinal issues[,]" Elmora Hebrew Ctr. v. Fishman, 125 N.J. 404, 414 (1991), and "have the power . . . to enforce secular contract rights, despite the fact that the contracting parties may base their rights on religious affiliations." Id. at 413-414; see also Chavis v. Rowe, 93 N.J. 103, 108 (1983) (noting a distinction between a court having to defer to highest church authority in a hierarchical church and enforcing decisions made by a governing body in a congregational church). A court may resolve a dispute "by application of neutral principles to the language of deeds, church charters, state statutes governing the holding of church property, and provisions in a church's constitution." Elmora Hebrew Ctr., 125 N.J. at 415 (quotations omitted).

Here, the parties' claims arise from Islamic Center's constitution and bylaws and do not involve religious doctrine or practices. The trial court's

findings of fact and conclusions of law concern whether Islamic Center complied with the procedures set forth in its organizational documents. Judge LaConte applied neutral principles of law to determine if Salahuddin was lawfully removed from office. Resolution of the parties' purely secular claims did not trespass on their religious freedoms.

With respect to Salahuddin's substantive claims, our scope of review of the judge's findings in this nonjury case is limited. We must defer to the judge's factual determinations, so long as they are supported by substantial credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). This court's "[a]ppellate review does not consist of weighing evidence anew and making independent factual findings; rather, [this court's] function is to determine whether there is adequate evidence to support the judgment rendered at trial." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). We only review de novo the court's legal conclusions. Manalapan Realty, L.P. v. Twp. Comm., 140 N.J. 366, 378 (1995).

Having carefully reviewed Salahuddin's arguments in light of the record and applicable legal principles, we are convinced there is substantial, credible evidence supporting Judge LaConte's findings of fact. We also agree with his

10

legal conclusion Islamic Center complied with its constitution and bylaws when removing Salahuddin as finance director and Shura Board member. We therefore affirm the August 21, 2018 final judgment for the reasons stated in Judge LaConte's written opinion. We add the following comments.

The trial court found Islamic Center's constitution and bylaws adopted in November 2015, expressly permit removal of an officer and Shura Board member by a two-thirds majority vote of the Shura Board, followed by a majority ratification by the membership. There is substantial, credible evidence in the record supporting the trial court's conclusion Islamic Center complied with these procedures when removing Salahuddin from office. In support of her argument to the contrary, Salahuddin relies on a voting requirement stated in unsigned bylaws, the adoption of which was not established at trial.

Salahuddin also argues the trial court erred when it found she received notice of the Shura Board meetings at which her removal was considered. She contends Judge LaConte erroneously found Imam Farra'd to be credible on this point, despite his criminal history.

We see no error in the trial court's reliance on Imam Farra'd's testimony. Judge LaConte was in the best position to determine Imam Farra'd's credibility, having heard his testimony. We note that despite his criminal history, Imam

Farra'd was selected as the spiritual leader of Islamic Center, apparently having satisfactorily demonstrated his rehabilitation. Also, Judge LaConte expressly found Salahuddin's testimony lacking in credibility in some respects. Notably, although Salahuddin testified she was not notified of the Shura Board's meetings, she was in attendance at both relevant meetings, and conceded that dozens of people from Islamic Center and other mosques in Newark attended one of the meetings to support her, raising doubts as to the veracity of Salahuddin's claim to have been unaware the meeting was to take place.

Finally, we disagree with Salahuddin's arguments the trial court erred by removing her as a director of 4th Ward, CDC and Sadaqa, Inc. The August 21, 2018 final judgment does not mention either of those entities. The trial court concluded only that Islamic Center legally removed Salahuddin from finance director and Shura Board member. In addition, the amended complaint does not seek a judgment that Salahuddin was legally removed from office with 4th Ward, CDC or Sadaqa, Inc. The issue, therefore, was not examined at trial. As a result, we do not address any office Salahuddin may have had with 4th Ward, CDC or Sadaqa, Inc. The parties, of course, are free to seek clarification from the trial court with respect to the effect of its final judgment on Salahuddin's positions, if any, with 4th Ward, CDC or Sadaqa, Inc.

A-0387-18T1

We note, however, the record contradicts Salahuddin's argument 4th Ward, CDC and Sadaqa, Inc. are distinct entities from Islamic Center. The November 2015 Islamic Center constitution refers to 4th Ward, CDC and Sadaqa, Inc. as committees of Islamic Center, with the chairman of each committee selected by the Shura Board and members of the committees serving solely at the discretion of Islamic Center.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0387-18T1