608 A.2d 218

BENJAMIN ALICEA, PLAINTIFF–APPELLANT, v. NEW BRUNS-
WICK THEOLOGICAL SEMINARY, A NOT FOR PROFIT COR-
PORATION, DEFENDANT–RESPONDENT, AND ROBERT A.
WHITE, DEFENDANT.

Argued October 22, 1991—Decided June 1, 1992.

304

*Ronald K. Chen* argued the cause for appellant.

*Aron M. Schwartz* argued the cause for respondent (*Vogel, Chait, Schwartz and Collins,* attorneys).

The opinion of the court was delivered by

CLIFFORD, J.

On this appeal we apply the principles declared in *Welter v. Seton Hall University,* 128 *N.J.* 279, 608 *A.*2d 206 (1992), decided this day, in which we hold that enforcement of an employment contract did not violate the First Amendment because the plaintiffs neither performed ministerial functions for defendant Seton Hall University nor could reasonably have contemplated that compliance with Roman Catholic Canon Law constituted an implied covenant of or condition precedent to the employment contract. In this case, after defendant New Brunswick Theological Seminary (NBTS) refused to confer tenure-track status on plaintiff, the Reverend Benjamin J. Alicea, he brought suit, alleging breach of an employment promise. The Law Division granted NBTS's motion for summary judg-

ment based on the First Amendment, and the Appellate Division affirmed. 244 *N.J.Super.* 119, 581 *A.*2d 900 (1990). We granted certification, 126 *N.J.* 329, 598 *A.*2d 887 (1991), and now affirm.

## I

The General Synod governs the Reformed Church of North America (the Church), which the Appellate Division characterized as a "hierarchical ecclesiastical body." 244 *N.J.Super.* at 122, 581 *A.*2d 900. The General Synod enjoys "an original authority over all the seminaries * * *, the appointment and installation of their professors, and the regulation of the courses of instruction" formally affiliated with the Church. *Ibid.* The Church's Board of Theological Education (BTE) supervises the Church's seminaries, including NBTS.

Although NBTS seeks "to prepare men and women for educated and faithful leadership in the [C]hurch * * * and * * * in specialized ministries," it offers degrees, in conjunction with other institutions, that incorporate non-ecclesiastical disciplines. 244 *N.J.Super.* at 123, 581 *A.*2d 900. NBTS does not confer secular degrees other than those conferred through that inter-institutional program. Because recent enrollment has increasingly reflected a non-Church-member student body, the seminary has appointed several faculty members and administrators who are ordained as ministers in other Christian religions. However, all non-Church-ordained faculty and administrators must subscribe to the Church's Declaration for Professors of Theology, attest to the Church's doctrinal standards, and submit to the jurisdiction of BTE. As the Appellate Division observed, "NBTS is an institution of the Church and is wholly accountable to it." *Ibid.*

BTE incorporated NBTS as a non-profit corporation under *N.J.S.A.* 15A:16–2. The General Synod is the sole shareholder, with BTE exercising supervisory authority over NBTS. To be a member of BTE, one must be either a minister or lay member

of the Church. All BTE members serve as NBTS trustees, and the president of NBTS serves as member *ex officio* of BTE. Only BTE may grant full-time faculty appointments for terms exceeding one year, and only BTE may promote administrators and faculty. NBTS's comprehensive faculty-personnel manual provides that after efforts at resolving faculty grievances have failed, the grievant "may * * * appeal[ ] to [BTE] through its Student and Faculty Concerns Committee." The manual also sets forth, although somewhat ambiguously, the procedure by which faculty members are to be considered for tenure.

Alicea, an ordained minister of the Church who began working for NBTS in 1978, was promoted in 1980 to the position of Director of NBTS's Urban Studies Program, which offers evening theology courses. After the three-year term of plaintiff's appointment as head of that program had expired, the Reverend Howard Hageman, then President of NBTS, offered plaintiff a position as assistant professor. Alicea accepted the one-year appointment to NBTS's faculty. The present litigation centers on the terms and effect of that employment offer.

Alicea characterizes his appointment by Hageman as one component of a larger plan according to which plaintiff agreed to forego a professorship at the San Francisco Theological Seminary and to remain at NBTS. He emphasizes that at the time of his appointment to the faculty, NBTS suffered a shortage of evening-program personnel. As further evidence of NBTS's need for plaintiff's skills during that period, Alicea cites the end of the affiliation between the New York Theological Seminary and NBTS, and the resignation of a faculty member in the same field as plaintiff. Alicea alleges that in exchange for his agreement to remain at NBTS, Hageman assured him that he would be placed on tenure-track status and that he would be granted tenure after completion of his doctoral studies.

Relying on the provision of BTE's bylaws that authorizes the President to make only one-year appointments, NBTS charac-

terizes the promise as one for a "temporary and non-tenure-track" promotion that did not require BTE ratification. Hageman concedes that BTE never reviewed the appointment. Alicea explains NBTS's conspicuous failure to observe formal procedure by alleging that the Church had long since abandoned that review mechanism in favor of *ad hoc* appointments by the President. Plaintiff contends, in effect, that by implicitly ratifying such informal procedures, NBTS had conferred apparent authority on Hageman to grant plaintiff eventual tenure status. After plaintiff resigned and efforts at settlement stalled, he filed this suit against NBTS and the Reverend Robert A. White (Hageman's successor), claiming that he had been constructively discharged and that he had resigned under duress.

The trial court, declining to exercise jurisdiction over what it perceived to be "a religious, doctrinal dispute," granted NBTS's motion for summary judgment. See 244 *N.J.Super.* at 127, 581 *A.*2d 900. The court held further that plaintiff's agreement with Hageman was unenforceable because it had not been ratified by BTE, *ibid.;* because plaintiff had failed to exhaust all administrative remedies available in the Church; and because plaintiff had resigned.

The Appellate Division affirmed, first noting that "this case is devoid of questions relating to spiritual matters or church doctrine * * * even though it arose as a result of a controversy over church practice." 244 *N.J.Super.* at 127–28, 581 *A.*2d 900. After recounting the law of apparent authority and enforceable employment promises, the court balanced the State's "legitimate interest" in adjudicating contract disputes against the "independence from secular control" conferred on religious institutions by the First Amendment. *Id.* at 130–31, 581 *A.*2d 900; see *Kedroff v. Saint Nicholas Cathedral,* 344 *U.S.* 94, 116, 73 *S.Ct.* 143, 154, 97 *L.Ed.* 120, 136 (1952).

The court explained that although New Jersey courts defer to determinations by religious authorities in hierarchical religions

in matters of religious doctrine or church polity, the Supreme Court has also authorized resort to neutral principles of law for resolution of intra-faith disputes. 244 *N.J.Super.* at 132, 581 *A.*2d 900. The Appellate Division described that approach as "call[ing] for the secular examination of church deeds, constitutions, bylaws, canons and the like for settling church disputes, thereby freeing 'civil courts completely from entanglement in questions of religious doctrine, polity, and practice.'" *Ibid.* (quoting *Jones v. Wolf,* 443 *U.S.* 595, 603, 99 *S.Ct.* 3020, 3025, 61 *L.Ed.*2d 775, 785 (1979)). Recognizing that the neutral-principles-of-law method "constitutes a sensible accommodation of religious and secular values," *ibid.,* the court below nevertheless concluded that application of that approach to this case would not "serve the interests of justice." *Id.* at 133, 581 *A.*2d 900. The court based that conclusion on its perception that assessment of Hageman's apparent authority to offer eventual tenure to plaintiff, even if based on church documents, bylaws, and the like, would require "careful scrutiny of past practices and customs" and "extensive inquiry into church polity." *Id.* at 133–34, 581 *A.*2d 900. Because that analysis would "threaten the freedom of the church from secular entanglement," the court affirmed the dismissal of plaintiff's complaint, but added that it "expected" NBTS to comply with its faculty manual by submitting the dispute to the Student and Faculty Concerns Committee. *Id.* at 135–36, 581 *A.*2d 900.

## II

The arguments in this case differ slightly from those in *Welter, supra,* 128 *N.J.* 279, 608 *A.*2d 206. In *Welter,* the defendant, a Roman Catholic university, relied on the Free Exercise Clause in asserting that because Roman Catholic Canon Law superseded the "notice" provisions of the employment contract at issue, the First Amendment required that courts abstain from enforcing those provisions. In this case, NBTS claims that entertaining jurisdiction over the parties'

dispute would entail impermissible entanglement with Church administration. See Laurence H. Tribe, *American Constitutional Law* § 14–11, at 1230–31 (2d ed. 1988) (noting that "several lower courts have carved out regulatory exemptions for religious organizations, especially in employment laws"). Apparently agreeing with NBTS's contention, the Appellate Division based its holding on the sound principle that when courts foresee that resolution of even secular factual disputes would result in regulatory entanglement in church business, judicial abstention is merited. 244 *N.J.Super.* at 128, 581 *A.*2d 900. However, because we conclude that enforcement of Hageman's promise would violate NBTS's right to the free exercise of its religious beliefs, we do not reach the question of whether historical inquiry into NBTS's past hiring practices would amount to unconstitutional regulatory entanglement.

■ Before this Court plaintiff argues that the First Amendment precludes only determinations concerning doctrine, not those that require intrusion into church polity. However, "even while approving in theory a state's freedom to apply neutral principles to a dispute over church property, the United States Supreme Court also cautioned that courts must avoid *questions of ecclesiastical polity or doctrine* and should ordinarily defer to recognized church authority on such questions." *Elmora Hebrew Center v. Fishman*, 125 *N.J.* 404, 415–16, 593 *A.*2d 725 (1991) (emphasis added) (citing *Jones, supra*, 443 *U.S.* at 602, 99 *S.Ct.* at 3024, 61 *L.Ed.*2d at 784). And in *Welter* we recognized that governmental interference with the polity, *i.e.*, church governance, of a religious institution could also violate the First Amendment by impermissibly limiting the institution's options in choosing those employees whose role is instrumental in charting the course for the faithful.

In arguing that this Court should narrowly construe First Amendment-based jurisdictional limitations, plaintiff emphasizes NBTS's status as a not-for-profit corporation under *N.J.S.A.* 15A:2–1a and its concomitant statutorily-conferred

power to enter into legally enforceable contracts under *N.J.S.A.* 15A:3–1a(7). He asserts that courts should not allow one who enjoys the right to enforce contracts to avoid the obligations of those contracts by resort to constitutionally-conferred immunity.

As indicated in *Welter, supra,* 128 *N.J.* 279, 608 *A.*2d 206, we refuse to adopt a *per se* rule that courts may not entertain employees' suits against religious institutions or leaders. However, both this Court and the United States Supreme Court have recognized that "there are many cases in which court intervention is simply inappropriate because judicial scrutiny cannot help but violate the first amendment." *Fishman, supra,* 125 *N.J.* at 416, 593 *A.*2d 725 (citing *Serbian Orthodox Diocese v. Milivojevich,* 426 *U.S.* 696, 720, 96 *S.Ct.* 2372, 2385, 49 *L.Ed.*2d 151, 170 (1976); *Presbyterian Church v. Hull Church,* 393 *U.S.* 440, 89 *S.Ct.* 601, 21 *L.Ed.*2d 658 (1969); *Chavis v. Rowe,* 93 *N.J.* 103, 459 *A.*2d 674 (1983)). Independent of the prohibition against regulatory entanglement, relied on by the Appellate Division in this case, that principle represents judicial recognition of the fact that some cases, because of the doctrinal nature of the dispositive issue, should not be in our courts. In construing the exemption from the Civil Rights Act of 1964 (Title VII) for the decisions of religious institutions regarding employees who perform ministerial functions, see 42 *U.S.C.A.* § 2000e–1, federal courts have recognized that "perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." *Rayburn v. General Conference,* 772 *F.*2d 1164, 1168–69 (4th Cir.1985), *cert. denied,* 478 *U.S.* 1020, 106 *S.Ct.* 3333, 92 *L.Ed.*2d 739 (1986). When State action would impose restrictions on a religious institution's decisions regarding employees who perform ministerial functions under the employment relationship at issue, courts may not interfere in the employment relationship unless the agreement between the parties indicates that they have waived their free-exercise rights and unless the

incidents of litigation—depositions, subpoenas, document discovery and the like—would not unconstitutionally disrupt the administration of the religious institution. *See Little v. Wuerl*, 929 *F.*2d 944, 949 (3rd Cir.1991) (citing *NLRB v. Catholic Bishop of Chicago*, 440 *U.S.* 490, 502, 99 *S.Ct.* 1313, 1320, 59 *L.Ed.*2d 533, 542 (1979)); Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 *Colum.L.Rev.* 1371, 1373 (1981)); *Rayburn, supra*, 772 *F.*2d at 1171.

■ Thus, in assessing whether adjudication of intra-religion employment disputes would transgress the First Amendment a court should first ascertain whether, because of the ministerial role played by the employee, the doctrinal nature of the controversy, or the practical effect of applying neutral principles of law, the court should abstain from entertaining jurisdiction. *Welter, supra*, 128 *N.J.* at 290–291, 608 *A.*2d at 211–212; *see Fishman, supra*, 125 *N.J.* at 416, 593 *A.*2d 725; *Chavis, supra*, 93 *N.J.* at 110–11, 459 *A.*2d 674. In assessing the extent to which the dispute implicates issues of doctrine or polity, factors such as the function of the employee under the relationship sought to be enforced, the clarity of contractual provisions relating to the employee's function, and the defendant's plausible justifications for its actions should influence the resolution of that threshold question.

■ If neither the threat of regulatory entanglement, the employee's ministerial function, nor the primarily-doctrinal nature of the underlying dispute mandates abstention, courts should effectuate the intent of the parties to the contract. Specifically, courts should enforce express agreements or implied promises to comply with religious doctrine when they can determine compliance or non-compliance with such agreements by application of neutral principles of law. Similarly, courts should honor contractual waivers of any rights to act in accordance with or under the compulsion of religious beliefs to the

extent that enforcement through litigation would not unconstitutionally entangle church and State. In discerning the reasonable intent of the parties, courts should focus on factors such as the text of the contract or employment manual, on whether the employee's duties included supervision of impressionable adherents, and on the function to have been performed by the employee. Either party's position as a church official is also a relevant, but not dispositive, factor. Conversely, if the employee performs a function that would otherwise require abstention, the court must determine whether the parties nevertheless intended to submit their dispute to the civil courts and, if such intent be found, whether such submission would nonetheless entail impermissible entanglement.

## III

In *Welter*, because the defendants had failed to establish either that the plaintiffs had fulfilled a ministerial function under the employment contract or that doctrinal issues permeated the case, we determined that the First Amendment did not require abstention. The fact that the Welters, two Roman Catholic nuns, held clerical office did not alter that result. (In the absence of the prospect of an apparent-authority or similarly intrusive inquiry, none of the defendants in *Welter* mounted a regulatory-entanglement challenge.) We then decided that the record could not support the conclusion that the parties had reasonably contemplated that compliance with Canon Law would constitute a condition precedent to, or implied covenant of, the contract. In this case, however, we conclude that in his role as Associate Professor of Theology at NBTS, the Reverend Mr. Alicea performed a ministerial function. Therefore, although the case would entail adjudication of polity rather than assessments of doctrine, the First Amendment requires judicial abstention from the exercise of jurisdiction over the case.

Plaintiff clearly played a ministerial role at NBTS. According to the job description in the faculty manual, plaintiff, as

the Director of Urban Studies, was responsible for "the successful promotion and management of the New York Urban Program and the development of the New Brunswick Urban Program" and functioned as "an advisor to minority students." As Director of Urban Studies, Alicea also "made recommendations regarding curriculum and methods for all students interested in or preparing for ministry in urban areas." As a conduit between the church hierarchy and its minority seminarians and the urban population, plaintiff functioned as a spokesperson for the church. As Dean of the Evening Theological Program and Assistant Professor of Church History, Alicea would have played a similarly instrumental role in training ministers, who are "the chief instrument by which the Church seeks to fulfill its purpose." *McClure v. Salvation Army*, 460 *F.*2d 553, 558–59 (5th Cir.), *cert. denied*, 409 *U.S.* 896, 93 *S.Ct.* 132, 34 *L.Ed.*2d 153 (1972).

That NBTS required its non-Church-ordained theology professors to acknowledge the basic theological tenets of the Reformed Church reinforces that conclusion. That requirement highlights the doctrinally-sensitive nature of the responsibilities accompanying such a position in any seminary.

## IV

Our conclusion that the First Amendment mandates judicial abstention in this case disposes of the need for more than a cursory inquiry into the parties' intent regarding the contracted-for employment obligations. Neither party disputes that the contract does not contain any mandatory provision regarding submission to jurisdiction of the civil courts. However, we must address plaintiff's argument that our holdings in *Fishman, supra,* 125 *N.J.* 404, 593 *A.*2d 725, and *Baugh v. Thomas,* 56 *N.J.* 203, 265 *A.*2d 675 (1970), require remand of the dispute to a religious body—here, BTE—according to the optional procedures in the NBTS faculty manual. Quite aside from the fact that this case centers on whether the Reverend Mr. Hageman had apparent authority to disregard the limita-

tions implicit in the manual, plaintiff's argument misinterprets *Fishman.*

In *Fishman,* we did not reach the underlying First Amendment jurisdictional questions. 125 *N.J.* at 416, 593 *A.*2d 725. Instead, we held that the parties had consented to the proceedings before the religious tribunal, whose rulings the plaintiff had challenged. *Id.* at 417, 593 *A.*2d 725. Just as parties may waive the right to exercise certain aspects of their religion by entering into a contract to that effect, so may they waive such rights by actions inconsistent with a jurisdictional challenge. *Fishman* does not require forced arbitration of religious issues. *See Hardwick v. First Baptist Church,* 217 *N.J.Super.* 85, 89 n. 2, 93, 524 *A.*2d 1298 (App.Div.1987) ("We decline * * * to direct reference of any matter to any ecclesiastical authority not recognized by both parties because that could assume resolution of the very doctrinal dispute in question.").

Understood in that context, the Appellate Division's recommendation that NBTS comply with the grievance procedures in the faculty manual amounts to nothing more than that: a strong suggestion that NBTS abide by the optional procedures it had implemented. Enforcement of the ministerial-employment agreement would have violated the Free Exercise Clause whether based on actual or apparent authority. Thus, plaintiff's argument that the court below inconsistently explored Church practices in determining whether the Reverend Mr. Hageman had the actual authority to extend tenure-track is flawed.

█ Neither did the Appellate Division's examination of the faculty manual to determine whether NBTS had conferred actual authority on the Reverend Mr. Hageman amount to impermissible regulatory intrusion. Although today we have recognized in *Welter* that a religious organization and adherent may, in their employment contract, affect the right to act or refrain from acting in conformance with religious strictures, 128 *N.J.* at 290–291, 608 *A.*2d at 211–212, we cannot enforce the provisions in the NBTS manual. We do not intend to foreclose

a holder of ecclesiastical office, including a minister, from enforcing contractual provisions that expressly impose mandatory safeguards amenable to constitutional application of neutral principles of law. However, we cannot enforce contractual provisions, like those in the NBTS employment manual, that are both vague and clearly optional.

The procedures we enforced in *Baugh* had been agreed to by attorneys for both parties. See 56 *N.J.* at 205, 265 *A*.2d 675. That case, then, is entirely consistent with our holding in *Fishman* that in appropriate cases we will enforce clearly-defined procedures to which the parties have voluntarily consented. Moreover, as the Appellate Division indicated, the very existence of the proper or traditional *ad hoc* procedures for promotion in NBTS form the crux of the dispute in this case. *Cf. Chavis, supra,* 93 *N.J.* at 111, 459 *A*.2d 674 (holding that dissecting polity of religion in absence of procedures provable with sufficient clarity results in unconstitutional entanglement) (citing *Baugh, supra,* 56 *N.J.* at 208, 265 *A*.2d 675). The doctrinally-sensitive nature of the positions at issue in this case also precludes application of *Baugh* to the facts before us. *Baugh* recognized that even though the opportunity for worship in familiar surroundings is a "valuable" right that deserves protection, that right is subject to constitutional barriers. 56 *N.J.* at 208, 265 *A*.2d 675. Although of inestimable value to the person invoking it, the right at issue in *Baugh* does not implicate the same concerns as does the interference with a religious institution's choice of those who should teach its doctrine or of those who should train the teachers. Under the circumstances of this case we decline to mandate adherence to the grievance procedures in the NBTS manual.

*Judgment affirmed.*

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.