715 A.2d 1033 (1998)
314 N.J. Super. 613
Thomas J. KLEPPINGER, Arthur David Seeland, Leslie Hamlett, James Richard McNeley and Alexander E. Price, Plaintiffs,
v.
ANGLICAN CATHOLIC CHURCH, INCORPORATED, a New Jersey nonprofit corporation, Michael Dean Stephens, John T. Cahoon, Jr., Brother John-Charles, James E. Bromley, William F. Burns, Victor Manuel Cruz-Blanco, Joseph P. Deyman, James O. Mote, William DeJ. Rutherfoord and Stanley F. Lazarczyk, Defendants.
Superior Court of New Jersey, Chancery Division, Mercer County.
Argued March 16, 1998.
Decided April 16, 1998.
*1034 Ezra D. Rosenberg, and David A. Kotler, Lawrenceville, for plaintiffs (Dechert, Price & Rhoads, attorneys).
Edward V. Cattell, Jr., for defendants (Hollstein Keating Cattell Johnson & Goldstein P.C., attorneys).
ANTHONY J. PARRILLO, P.J.Ch.
Plaintiffs are a group of five Bishops Ordinary of defendant Anglican Catholic Church *1035 (Church or ACC) who were also Trustees of the Anglican Catholic Church, Inc. (ACC, Inc.), a New Jersey nonprofit corporation and corporate manifestation of the Church. They move by order to show cause seeking to restrain and enjoin defendants Church and certain of its representatives from giving effect to "Writs of Inhibition" issued to plaintiffs and from interfering with plaintiffs' exercise of their powers as Bishops Ordinary and Trustees pending determination of their underlying action for declaratory and equitable relief adjudicating that plaintiffs are Bishops Ordinary of the Church and lawful trustees of the ACC, Inc., with all the rights and privileges afforded those positions and rendering null and void all contrary actions by defendants. Defendants cross move for dismissal of the action as beyond the subject matter jurisdiction of the court.
By way of background, the following historical facts appear undisputed. The Anglican Catholic Church is an international religious organization that was founded in the late 1970s. At present, the Church has more than 10,000 members.
The Church is hierarchical in structure, organized geographically into two Provincesthe Original Province and the Province of India. The highest level of the Church is the Original Province which is comprised of fifteen territories throughout the western hemisphere, Europe and Australia. The head of the Original Province is the Metropolitan (or Archbishop) who is also the head of the Church and presides over its governing bodies: the Provincial Synod, the Provincial Court and the College of Bishops. Each of the fifteen territories which comprise the Original Province operates its own diocese which is headed by a Bishop Ordinary.
In 1978, the Church incorporated itself as Defendant ACC, Inc. under the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 to -10. The corporate purpose is "to carry on religious, educational and benevolent institutions and works in affiliation with parishes and other church organizations and associations and for the purpose of the organization of the Anglican Catholic Church." The corporation maintains its registered office in Mountain Lakes, New Jersey and conducts business in Mercer County. Both the Church and the corporation are controlled by the same set of rulesthe Constitution and Canons of the Church which constitute the bylaws of ACC, Inc.and interlocking governing bodies. Thus the Metropolitan of the Original Province is the chief executive and administrative officer of the Church as well as the ex officio president of the corporation. As noted, each diocese is headed by a Bishop Ordinary who sits on the Church's College of Bishops which, in turn, serves as the Board of Trustees of the corporation. Prior to August 1997, each of plaintiffs was a Bishop Ordinary of the Church and a Trustee of ACC, Inc.
The present controversy stems from an apparent doctrinal schism in the Church and the power struggle which ensued. One of its earliest manifestations occurred sometime in April 1997 when a disagreement arose as to whether Bishop Thomas J. Kleppinger or Bishop John Cahoon was the "Senior Bishop Ordinary" and therefore next in line to become Acting Metropolitan until the election of a new Metropolitan. The issue was significant because on March 23, 1997, then Archbishop William O. Lewis, Metropolitan of the Church, had suffered a stroke, leading some to question his capacity to continue in that position.
By petition in June, 1997, Archbishop Lewis submitted the question of the proper interpretation of Article VI, Section 6 of the Church Constitution [entitled OF A VACANCY IN THE OFFICE OF THE METROPOLITAN] to the Provincial Court. It was determined by the Provincial Registrar that Bishop John Cahoon was the Senior Bishop Ordinary of the Church after the Metropolitan. That decision was eventually ratified by the Provincial Court on August 28, 1997 in its "Definitive Sentence" declaring Bishop Cahoon senior to Bishop Kleppinger but only after a purported settlement of the issue (the Athens Agreement) reached on July 19-20, 1997 fell apart at a rather raucous meeting of the College of Bishops at Holyrood Seminary on August 4, 1997. That meeting abruptly ended after plaintiff Bishop James McNeley allegedly struck Bishop Joseph Deyman, supposedly resulting in his automatic "self-excommunication" *1036 from the Church and "Inhibition" pursuant to Writ issued against him by Archbishop Lewis on August 7, 1997.
On August 5, 1997, one day after the College of Bishops meeting, plaintiffs McNeley, Bishops Arthur Seeland and Leslie Hamlett executed a "Certificate of Incapacity" certifying to the incapacitation of Archbishop Lewis and declaring Bishop Kleppinger Acting Metropolitan of the Church.[1] The next day, Bishops Kleppinger, Hamlett and Seeland executed a document entitled "For the Peace of the Church" exhorting Bishops, clergy and laity of the Church to support its signers in repudiating "Traditional Episcopalians". Bishop Kleppinger signed this "encyclical letter" using the title "Acting Metropolitan". The letter was also signed later by plaintiffs Bishops McNeley and Alexander Price.
This resulted in formal charges filed against plaintiff Bishops for invasion of the "Patrimony of the Metropolitan". These charges were accompanied by "Writs of Inhibition" issued by Archbishop Lewis on August 19, 1997, prohibiting plaintiffs from exercising any ecclesiastical office in the Church until the charges have been disposed of at trial before the Provincial Court but allowing them, in the meantime, to retain their titles and receive their stipends and participate in the communion of the Church as members.
As noted, on August 28, 1997, the Provincial Court issued its "Definitive Sentence" declaring Bishop Cahoon to be Senior Bishop Ordinary. Thus, upon Archbishop Lewis' death on September 23, 1997, Bishop Cahoon succeeded as Acting Metropolitan by right of seniority. He served in that capacity until October 15, 1997 when defendant Bishop Michael Dean Stephens was elected to the position of Archbishop and Metropolitan of the Church by vote of the biannual Provincial Synod of the Church assembled at Norfolk, Virginia. Bishop Stephens was formally installed in that Office that same day by the College of Bishops. Simultaneously, the five plaintiff Bishops convened their own Synod in Allentown, Pennsylvania and there elected Bishop Hamlett as Archbishop and new Metropolitan.[2]
Plaintiffs now contend that their inhibitions were violative of the Constitution and Canons of the Church, and the bylaws of ACC, Inc., which do not authorize the inhibition of a Bishop by the Metropolitan or anyone else for that matter either pendente lite or otherwise, and contravened due process protections required by Church law for the removal of a Bishop. Thus, plaintiffs argue that while Church law expressly provides that a Bishop Ordinary may inhibit clergy, priests and deacons from officiating in certain circumstances, a Bishop may not be *1037 removed from office through a Writ of Inhibition but only in accordance with the specific procedures set forth therein, including a trial by a duly constituted court after suspension for "abandonment of the communion of the church" by the Metropolitan acting with the written consent of three Bishops Ordinary.
Defendants counter that plaintiffs have not been "removed" but simply "inhibited" which is not a measure of discipline under ecclesiastical law but merely a procedural (interlocutory) remedy to temporarily restrain the inhibited clergyman from carrying out the functions of office pending appropriate proceedings in accordance with the law of the Church. Even plaintiffs acknowledge that inhibition is expressly provided for in the Canons and Constitution of the Church and made applicable to "clergymen"a class which defendants claim include Bishops. In any event, defendants maintain, the power to issue Writs of Inhibition comes from the inherent, general, residual authority of the Metropolitan as established in Church custom, the General Cannon Law (corpus juris canonici) and the Ecclesiastical Common Law (ius commune ecclesiasticum), i.e., that body of recorded decisional law as declared over the centuries by church councils, synods and tribunals and as received by the Church from the Church of England dating as far back as the Second Centuryall of which comprise the bylaws of the ACC, Inc.[3] Defendants conclude that in matters of order, discipline and governance in the Church, which they say are clearly implicated by plaintiffs' demands in this litigation, this court must defer to the decisions of a hierarchical church's highest body. Such matters, they claim, may not be resolved by the application of neutral principles of law but rather only by reference to the doctrine and polity of the Church which this court is precluded from deciding because of the constitutional command to maintain separation of Church and State.
As a threshold matter, this court must determine whether it has jurisdiction to decide the issues presented in this case. Consistent with the Establishment Clauses of our Federal and State Constitutions, forbidding the establishment of religionoften referred to as separation of Church and Statea court is precluded from interposing its judgment in matters of ecclesiastical doctrine, cognizance and polity. U.S. Const. amend 1; N.J. Const., art. I, par. 4. This "wall" of separation seeks to avoid the evil of excessive entanglement between government and religion. Ran-Dav's County Kosher, Inc. v. State, 129 N.J. 141, 152, 608 A.2d 1353 (1992). The constitutional stricture "rests upon the premise that both religion and government can best work to achieve their lofty aims if each is left free from the other within its respective sphere." People of Illinois, ex rel., McCollum v. Board of Education, 333 U.S. 203, 212, 68 S.Ct. 461, 92 L.Ed. 649 (1948).
The seminal case of Watson v. Jones, 13 Wall. 679, 20 L .Ed. 666 (1872), recognizes that the First Amendment circumscribes the role of civil courts in church disputes:
In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead us to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts and have them reversed.

[Id. at 728-29, 20 L.Ed. at 676-77.]
Watson held that in resolving property disputes within a hierarchical church, civil *1038 courts must defer to the highest church authority that has ruled on the matter, unless the express terms in the instrument by which the property is held condition the property's use or control in a specified manner. See Chavis v. Rowe, 93 N.J. 103, 108, 459 A.2d 674 (1983).
Such deference to religious authority was also recognized in Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952), involving an intrafaith dispute over the rightful occupant of a church position. In that case, Archbishop Leonty had been elected to preside over the American churches by the churches themselves, and Archbishop Fedchenkoff had been appointed to preside over the same churches by the Supreme Church Authority in Moscow. The Supreme Court ruled in favor of Archbishop Fedchenkoff, holding that the appointment of the Archbishop was a matter of ecclesiastical government with which the courts could not interfere, even though a property right might follow as an incident from the decision on the ecclesiastical issue by the church. 344 U.S. at 115, 73 S.Ct. 143.
Years later, the deference approach adopted in Watson was applied to a church dispute concerning a diocesan bishop removed by the central church and his breakaway diocese which repudiated the central church's actions and declared itself autonomous. In denying relief to the removed bishop, the Supreme Court in Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), held "`[w]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of [the] church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding ...'" 426 U.S. at 710, 96 S.Ct. 2372.[4]
Watson is not the only approach to church disputes, inasmuch as the First Amendment does not require the States to adopt a rule of compulsory absolute deference to religious authority in resolving all church disputes. See Jones v. Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the Supreme Court approved the application of "neutral principles of law, developed for use in all property disputes," for resolving litigation over church property that does not implicate religious doctrine or practice. That approach calls for the secular examination of church deeds, constitutions, bylaws, canons and the like for settling church disputes, thereby freeing "civil courts completely from entanglement in questions of religious doctrine, polity, and practice." Jones v. Wolf, supra, 443 U.S. at 603, 99 S.Ct. 3020. Neutral principles may be particularly suited for adjudications of civil contract actions as well. Welter v. Seton Hall Univ., 128 N.J. 279, 608 A.2d 206 (1992); Elmora Hebrew Center, supra, 125 N.J. at 420, 593 A.2d 725; Jewish Center of Sussex County v. Whale, 86 N.J. 619, 432 A.2d 521 (1981).
Thus courts are constitutionally entitled to resolve intrachurch disputes if they could do so by the application of wholly secular, legal rules to the language of church documents such as deeds, charters, bylaws and the like. See, e.g Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc., 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970). However, "general principles of property law may not be relied upon if their application requires civil courts to resolve doctrinal issues", id. at 370, 90 S.Ct. 499 (Brennan, J., concurring), or entails theological or doctrinal evaluations. As the Supreme Court explained in Milivojevich, supra: "... where resolution of the dispute cannot be made without extensive inquiry ... into religious law and polity", courts must accept the decision of the highest church body in a hierarchical church as binding. 426 U.S. at 709, 96 S.Ct. 2372. This is so even where it is *1039 claimed that the church decision is arbitrary and not in compliance with church laws and regulations, id. at 713, 96 S.Ct. 2372, because otherwise the court would be impermissibly examining internal church procedures and substituting its own interpretation of court rules for that of the church's highest body. Id. at 721, 96 S.Ct. 2372.
To be sure, the provisions of the church constitution at issue in Milivojevich, relating to a matter of internal church government, were not so express "that the civil courts could enforce them without engaging in a searching and therefor impermissible inquiry into church polity." 426 U.S. at 723, 96 S.Ct. 2372. Such a circumstance has proven dispositive in New Jersey cases a well. Thus, in Chavis v. Rowe, 93 N.J. 103, 459 A.2d 674 (1983), a deacon had been removed from his position although the church's constitution and bylaws provided no details on such a procedure. In the absence of clear direction in church law, our Supreme Court precluded judicial inquiry into the propriety of the removal procedures actually followed by the church in the defrocking of its deacon as impermissibly intruding on matters of church doctrine and polity and therefore prohibited by the First Amendment. Id. at 110, 459 A.2d 674. The Chavis Court stated:
The procedure for removing a deacon is ambiguous. That ambiguity would be properly resolved only by going beyond the by-laws and the constitution of Calvary to a study of the purpose and the philosophy of congregational structure in general and of disciplining congregational deacons in particular ... Such hermeneutics are beyond this Court's realm.
Moreover, insinuation by civil courts into the customs and usages of the by-laws and the constitution, into the administration and the polity of the church in the hope of uncovering clues to the correct disciplinary procedure, threatens the freedom of religious institutions from secular entanglement.

[93 N.J. at 112, 459 A.2d 674].
In contrast, courts have intervened in church affairs to determine whether established procedures of a religious organization have been followed in expelling a member. In Baugh v. Thomas, 56 N.J. 203, 265 A.2d 675 (1970), a member had been expelled by a majority vote of a Baptist church. The member challenged the voting process. Our Supreme Court held that a civil court could review the ministerial process of tallying votes since it involved determining only whether the vote was held in accordance with established procedures which were neither ambiguous nor vague, emphasizing that no question of religious doctrine or polity was involved in counting votes.
Similarly, in Hardwick v. First Baptist Church, 217 N.J.Super. 85, 524 A.2d 1298 (App.Div.1987), it was held that the court had jurisdiction to decide, in the first instance, whether plaintiffs, Spanish-speaking persons listed on the membership rolls of the First Baptist Church, were excluded as members of the congregationalist church or were expelled from membership in the church. As in Baugh, the church bylaws were clear and provided that membership first be passed upon by church deacons and then placed before the membership for a vote, although plaintiffs contended that this provision had fallen into disuse and had not been applied to many of the church's English-speaking members. The question in Hardwick was the effect of entering plaintiffs on the rolls of the church membership and voting later to exclude them. The Appellate Division found no bar to the court's reviewing, at least preliminarily and on a limited basis, the factual issue of whether particular members had already been accepted by the church and were later arbitrarily excluded. Hardwick, supra, 217 N.J.Super. at 92, 524 A.2d 1298. The court cautioned, however, that if the adjudication of whether a member had been accepted might implicate doctrinal issues (i.e., whether deacons are doctrinally required to pass upon membership preliminary to a congregational vote), then it would be inappropriate for the lower court to continue:
Under Baugh v. Thomas there is no impediment to a court's determining whether an individual is a member of a church; but under Chavis v. Rowe courts must refrain from adjudicating on theological grounds whether such individuals should be a member.

*1040 [Id.]
New Jersey cases have long recognized the distinction between spiritual matters and the administration of church affairs on the one hand and temporal matters of a church affecting civil or property rights on the other hand; between disputes essentially doctrinal in nature, ecclesiastical determination of which incidentally affects control over local church property, and disputes primarily secular in nature whose tangential doctrinal issues are inconsequential to civil enforcement of the secular interests involved. Elmora Hebrew Center v. Fishman, 125 N.J. 404, 414-415, 593 A.2d 725 (1991). Illustrative of the latter is Welter v. Seton Hall University, 128 N.J. 279, 608 A.2d 206 (1992), an employment contract dispute in a religious context which did not, however, implicate religious issues. In Welter, two nuns who had been employed by a religious academic university to teach computer science had been discharged by the university without a one year notice as provided in their contract. The contract did not incorporate canon law. Our Supreme Court held there was no First Amendment bar to the exercise of jurisdiction in the nuns' action for breach of contract, since they performed purely secular obligations and had no ministerial duties for the university.
However, in another faculty contract case, Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992), our Supreme Court deferred to religious authority who denied tenure track to a professor of theology supposedly without adherence to the grievance procedures in the seminary's manual. As a conduit between the church hierarchy and its minority seminarians and the urban population, plaintiff functioned as a spokesperson for the church. And as Dean of the Evening Theological Program, Alicea "would have played a similarly instrumental role in training ministers who are the chief instrument by which the church seeks to fulfill its purpose." Alicea, supra, 128 N.J. at 315, 608 A.2d 218. In declining jurisdiction, the Supreme Court recognized that governmental interference with the polity, i.e., church governance, of a religious institution could violate the First Amendment by impermissibly limiting the church's options in choosing those employees whose role is instrumental in charting the course for the faithful.
To sum up, the Establishment Clauses forbid government resolution of disputes religious in tenor and content. This constitutional stricture, however, does not prohibit judicial involvement in controversies between religious groups wholly secular in character such as church property disputes and civil contract actions. Thus, in deciding issues not implicating religious doctrine, courts are free to apply neutral principles of law to the language of church documents and instruments that is clear, provable and express. Conversely, where the church practice or procedure at issue is ambiguous or less than clearly defined and, because of this uncertainty, resolution of the dispute cannot be made without extensive inquiry into religious law and polity, courts must accept the decision of the highest church body in an hierarchical church as final and binding. This is so even where property or civil rights may be affected. Otherwise the courts' insinuation into the customs and usages, theology and doctrine of the church would threaten the freedom of the religious institution from secular entanglement.
Application of these principles of law to this case compels judicial abstention. Plaintiffs ask this court to overturn the decisions of a hierarchical church's highest authoritiesits Metropolitan (inhibition of plaintiffs) and Provincial Court (seniority declaration)on religious questions, which cannot be resolved by applying neutral principles of law and instead require extensive inquiry into internal church procedures and doctrinal decisions. This, the court cannot do without violating the Establishment Clauses of our Federal and State Constitutions, mandating separation of Church and State.
Plaintiffs refuse to accept their inhibitions on the ground these "sanctions" were not effectuated in accordance with the Constitution and Canons of the ACC. They contend the "law" of the Church does not provide for pretrial inhibition of a Bishop Ordinary and therefore such action by the Archbishop/Metropolitan *1041 is beyond his ecclesiastical authority. According to plaintiffs, a Bishop may be disciplined or sanctioned only in accordance with explicit methods set out in the Church's Constitution and Canons detailing specific procedural protections not afforded any of them in this instance.[5] As a result, plaintiffs argue, they have been deprived of their ecclesiastical (Bishop) and temporal (Trustee) positions without the process due them under church and civil law.
Lest there be any doubt, what is involved here is a struggle for the very soul of the Anglican Catholic Church. Plaintiffs' thinly veiled attempt to narrow this intrafaith dispute to a matter of process and procedure grossly overlooks the real controversy here and that is, which of these rival factions vying for control of this hierarchical church will end up in power. Indeed, plaintiffs were inhibited for breaking the Communion of the Church and Invading the Patrimony of Archbishop Lewis by failing to recognize the Metropolitan's authority, usurping it instead for themselves.[6] Their gripe appears as much with the Provincial Court's decision ousting Bishop Kleppinger from the line of succession to the Metropolitan's seat (seniority declaration) as with the remedial consequences (inhibitions) which attended their failure to abide that ecclesiastical determination of the church's highest judicial body.
In both instances, the decisions of the Provincial Court (seniority declaration) and Archbishop Lewis (inhibition of plaintiffs) are those of the Church's highest authorities on matters purely religious in nature, namely church governance and discipline, which this court must accept as final and binding. See Serbian Eastern Orthodox Diocese v. Milivojevich, supra, 426 U.S. at 717, 96 S.Ct. 2372 ("[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom or law.") See also Alicea v. New Brunswick Theological Seminary, supra, 128 N.J. at 311, 608 A.2d 218; Elmora Hebrew Center Inc. v. Fishman, supra, 125 N.J. at 414, 593 A.2d 725; Protestant Episcopal Church v. Graves, supra, 83 N.J. at 580-1, 417 A.2d 19; Diocese of Newark v. Burns, 83 N.J. 594, 417 A.2d 31 (1980), cert. denied 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Indeed, plaintiffs do not dispute that the ACC is a hierarchical church, the highest judicial body of which is the Provincial Court and the highest ruling body is the College of Bishops and that the Metropolitan is the head of the Church. Nor is there any real dispute that questions of church discipline, governance (polity) and the composition of the church's hierarchy are at *1042 the core of ecclesiastical concern. See Serbian Eastern Orthodox Diocese v. Milivojevich, supra, (civil court review of proceeding resulting in removal and defrockment of bishops of hierarchical church by religious bodies in whose sole discretion the authority to make such ecclesiastical decisions was vested was impermissible under First and Fourteenth Amendments); Gonzalez v. Roman Catholic Archbishop, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (determination of qualifications of a chaplain is canonical in nature); Kedroff v. Saint Nicholas Cathedral, supra, 344 U.S. at 118, 73 S.Ct. 143 (appointment of Archbishop is a matter of ecclesiastical government with which courts could not interfere); Protestant Episcopal Church v. Graves, supra (dispute between breakaway local parish and hierarchical parent church over church property is unquestionably doctrinal in nature, the ecclesiastical determination of which only incidentally affects the control over local church property); Elmora Hebrew Center, supra, 125 N.J. at 420, 593 A.2d 725 (holding that only religious authorities can determine scope of duties of "orthodox rabbi"). Without doubt, matters of church discipline are committed to the doctrine and polity of the religious organization. Chavis v. Rowe, supra, 93 N.J. at 110, 459 A.2d 674 (judicial inquiry into propriety of removal procedures followed in the case of a deacon would intrude impermissibly on matters of church doctrine and polity). Equally clear is that disputes over church governance, the composition of the church's hierarchy and the direction of subordinate bodies are strictly ecclesiastical in character. Justice Brennan, concurring in Maryland and Virginia Eldership, supra, wrote that:
To permit civil courts to probe deeply enough into the allocation of power within a church so as to decide where religious law places control over the use of church property would violate the First Amendment in much the same manner as civil determination of religious doctrine. Similarly, where the identity of the governing body or bodies that exercise general authority within a church is a matter of substantial controversy, civil courts are not to make the inquiry into religious law and usage that would be essential to the resolution of the controversy.

[396 U.S. at 369-70, 90 S.Ct. 499].
See also Hardwick v. First Baptist Church, supra, 217 N.J.Super. at 89, 93 n. 2, 524 A.2d 1298, ("We decline ... to direct reference of any matter to any ecclesiastical authority not recognized by both parties because that could assume resolution of the very doctrinal dispute in question.").
Yet having recognized that the ACC is hierarchical and that the disciplinary decisions at issue here were made by its highest authority, plaintiffs nevertheless seek to invalidate the Writs of Inhibition as beyond the Metropolitan's authority and not in accordance with the prescribed procedures of the ACC's Constitution and Canons. However, even assuming the underlying dispute to be primarily secular in naturewhich it decidedly is notthis controversy cannot be resolved by reference to neutral principles of law but requires a detailed review of internal church procedures and extensive inquiry into the nature, origin and scope of metropolitical jurisdiction.[7] Not only is such a detailed review impermissible under the Establishment Clauses of our Federal and State Constitutions, but such an inquiry entails an evaluation of conflicting evidence concerning internal church procedures and contradictory interpretations of ecclesiastical writings governing the office of the Metropolitan.[8] Irrespective *1043 of which version is correct, the point is that in reaching a conclusion, the court would have to consider and interpret wholly theological sources and ecclesiastical doctrine and not neutral principles of law.[9]
Unlike Baugh, supra, permitted the Court to examine whether "established procedures" of a religious organization, as proved, have been followed, in this case the appropriate procedures for inhibition of a Bishop Ordinary are less than clear or express. To be sure, plaintiffs argue the very lack of specific inhibition procedures supports their position that such a pendente lite remedy is beyond the jurisdiction of the Metropolitan whose authority is limited to that expressly conferred by the ACC's Constitution and legislated Canons. Defendants counter that in the absence of clearly defined "inhibition" procedures in the black letter law of the church, reference must be made to other sources of church law such as the general canon law and the ecclesiastical common law[10] which, they say, recognize an "inherent" metropolitical jurisdiction and prerogative reserved to the Archbishop as superintendent of the whole province.[11]
Thus, not only do the parties disagree over what procedures should have been followed, they also disagree over what body of church law applies. Actually, the dispute over process betrays a more fundamental rift over the Metropolitan's power and source of authority. And on that primary issue, two widely divergent views run on a virtual collision course. Whereas plaintiffs suggest the Archbishop is restrained by legislated canon law from proceeding to discipline a Bishop without the concurrence of fellow Bishops, defendants claim an inherent, residual authority conferred by general canon and common law to act alone to restrain an inferior Bishop pending the outcome of charges. Whatever the full extent of the Metropolitan's power, and whatever the source of that authority, the matter remains quintessentially an ecclesiastical concern not properly cognizable in a civil court. And the fact that ecclesiastical law is used by the Church to govern its own temporal affairs in the form of corporate bylaws does not render the dispute any less "ecclesiastical" or any more susceptible to civil court resolution.
That Baugh allows a court to examine whether the established procedures of a religious organization, as proved, have been followed, 56 N.J. at 208, 265 A.2d 675 (emphasis added), does not suggest that a civil court may dissect the entire body of laws of the ACC to find, for instance, whether the Archbishop has the same power over his deputy Bishops that every Bishop, by virtue of explicit authorization in the legislated canons, has over his diocese, including the authority to inhibit member priests and clergymen[12]; and if not, whether a remedy, i.e., *1044 inhibition of a Bishop, not expressly legislated by canon law, may nevertheless be invoked in accordance with the ecclesiastical common law; and if so, whether such a remedy may be imposed by the Metropolitan alone or only with the consent of his comprovincial Bishops.
What was said by our Supreme Court in Chavis v. Rowe, supra, in declining judicial review of church removal procedures in that case applies with equal persuasive force here:
In Baugh, this Court admonished a church to follow an established procedure relating to a ministerial process (tallying votes), whereas in this case plaintiffs would have us perform a task better left to exegetes.

[93 N.J. at 111-112, 459 A.2d 674].
Even more fundamentally, the parties dispute the consequences which attend an inhibition. Defendants maintain inhibition is not a disciplinary measure but simply a restraint of conduct. For this reason, they say, inhibition does not deprive the Bishop of his office or of the remunerations of that office, but only restrains him from carrying out the functions of his office pending appropriate proceedings and possible discipline. As such, plaintiffs herein have not been excluded from the communion of the Church, nor deprived of their offices as Bishops; they continue to receive all the financial emoluments thereof and remain members of the Church able to worship in and with the Church. Defendants contrast this situation from "suspension" which, as a form of discipline, and unlike "inhibition", acts immediately to suspend the Bishop from the office itself so to deprive him of the emoluments of that office. For this reason, suspension is attended by all the procedural protections afforded those facing like deprivations.[13]
Plaintiffs, on the other hand, equate "inhibition" to "removal" from office and in fact use these terms interchangeably. Although they ascribe a greater consequence to the challenged action than defendants admit,[14] there is absolutely no indication they have exhausted, or for that matter even invoked, the canon law procedures available to them to have the inhibitions set aside. In any event, this court need not decide whether plaintiffs' status as inhibited Bishops is a judicially protectable interest,[15] for even if that be the case, the fact remains that judicial inquiry into the propriety of the writs of inhibition issued in this case would intrude impermissibly on matters of church doctrine and polity. The status of plaintiffs within the Church pending trial and possible discipline is a matter for Church not State determination.
By parity of reasoning, plaintiffs' remaining requests that they remain functioning Trustees of the corporate entity, ACC, Inc., fare no better. The writs of inhibition, restraining plaintiffs from carrying out the functions of both their ecclesiastical and temporal offices, are acts not of the secular organization but of the Church, the independent operation of which is protected by the Establishment Clauses of our Federal and State Constitutions. Despite plaintiffs' constant references to their positions as Trustees of ACC, Inc., the relief they seek does not strictly pertain to the corporate entity but involves religious order, functions, discipline and governance and therefore is outside this court's jurisdiction.
*1045 For all these reasons, plaintiffs' application for preliminary restraints as well as their underlying complaint are dismissed for want of subject matter jurisdiction.
NOTES
[1] On August 7, Archbishop Lewis met with defendants Bishops James Mote, James Bromley and Dean Stephens, after which those three Bishops executed a certificate that Archbishop Lewis was competent to function as Metropolitan. Further, on August 10 Archbishop Lewis was examined by a board-certified psychiatrist and by a board-certified neurologist, both of whom declared him mentally competent and "competent to perform his duties" despite his stroke in March.
[2] Inevitably, questions concerning the authority of the Church's hierarchy continued after the October 15, 1997 elections. In one instance, on or about October 21, 1997, Defendant Stephens discharged David Gregson as acting Dean of Holyrood Seminary, terminated its instructional program and ordered Gregson to vacate the premises by October 24, 1997. To enforce this decree, defendant filed an action captioned The Anglican Catholic Church v. Seeland, et al., Index No. 3260/97 (N.Y.Sup.Ct., Sullivan County) for replevin and ejectment. After a hearing on the merits of the parties' respective preliminary injunction applications on November 10, 1997, the court enjoined and restrained Seeland and Gregson from entering the premises owned by defendant Church herein or from interfering with the business and operation of Holyrood Seminary. The court accepted as "final and binding" the August 28, 1997 decision of the Provincial Synod that the "Senior Bishop Ordinary" for purposes of Article VI, Section 4 of the Church's Constitution and of Title IV, Canon 10 of its Canons was Bishop Cahoon and not Bishop Kleppinger. Thus, the court concluded that as a Bishop under inhibition, Bishop Seeland "had and has no rights to the use and enjoyment of any church property" and therefore his entry upon Church land constituted trespass.

Interestingly enough, plaintiffs on the present application for preliminary restraints have not asked this court to set aside the decision of the Provincial Court establishing Bishop Cahoon's seniority over Bishop Kleppinger, although that relief is specifically requested in their underlying complaint.
[3] Constitution of ACC, Article IV, Section 8.
[4] New Jersey courts have utilized the hierarchical (Watson) approach in church disputes in this State. See Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 608 A.2d 218 (1992); Elmora Hebrew Center Inc. v. Fishman, 125 N.J. 404, 414, 593 A.2d 725 (1991); Protestant Episcopal Church v. Graves, 83 N.J. 572, 580-1, 417 A.2d 19 (1980), cert. den. 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).
[5] According to plaintiffs, as a general matter, Church Canons expressly provide only two procedures for the removal of a Bishop from office: one, after trial, by the Provincial Court and the other, where no trial is demanded, by the Metropolitan after the Bishop's suspension by the Metropolitan with the written consent of three Bishops Ordinary. See ACC Canons, Title IX, Canon 3.03; Title X, Canon 7.01. In either case, the removing authority must comply with detailed procedures set forth in the Canons.

In the case of a trial before the Provincial Court, the Bishop is entitled to, among other things:
(i) written notice of the charges; (ii) reasonable notice prior to the institution of the proceedings for the answer of the charge, the summoning of witnesses, and the gathering of evidence; (iii) a finding of Not Proven unless guilt is shown by good and sufficient evidence; (iv) the right to counsel or expert advice; (v) the right to challenge the impartiality of the Court; (vi) the right to examine and question all witnesses, depositions, testimonies and any relevant documents; (vii) the right not to testify; (viii) the right to open proceedings; (ix) a transcript of the record; and (x) the entry of a sentence of Not Proven unless a sentence of Proven is endorsed in writing by a majority of the Court sitting. See ACC Canons, Title IX, Canons 8(a) -(j).
[6] In fact, after their inhibition and the "Definitive Sentence" of the Provincial Court declaring Bishop Cahoon senior to Bishop Kleppinger, the inhibited plaintiff Bishops convened their own Synod in Allentown, Pennsylvania, elected plaintiff Bishop Hamlett Metropolitan/Archbishop of the ACC, and appointed provincial officers. Also, plaintiff Bishops issued Certificates of Abandonment of Communion and Writs of Suspension against each of the individual defendant Bishops.

Defendants maintain plaintiffs' actions are a nullity because they were taken while under inhibition and in any event constituted the de facto formation of a new church in which case plaintiffs are no longer within the ACC and are therefore without jurisdiction of any kind over defendants.
[7] The last sentence of Paragraph 2, Section 6, Article VI, [OF THE OFFICE OF THE METROPOLITAN], in the ACC Constitution reads as follows: "The Metropolitan shall have charge of ... the General Pastoral Concern and Metropolitical Jurisdiction of the Province." The term "metropolitical jurisdiction" is nowhere defined in the ACC Constitution, suggesting its proper content be found in the canons, both legislated and general, and common law of the Church.
[8] For instance, as to internal church procedures, compare Certification of F. Andrew Stahl (dated March 3, 1998) at pp. 6-8 and 33-34 with Certification of John A. Hollister, Esquire, No. 4 Supplementary Deposition at p. 10; and Opinion of Dr. Frank L. Wiswall, Jr. (dated December 29, 1997) at p. 7. As to whether Bishops are "clergymen" as that term is used in the ACC Constitution and Canons, compare Certification of F. Andrew Stahl at pp. 8-13 with Certification of John A. Hollister, Esquire, No. 4 Supplementary Deposition at pp. 2-8; and Opinion of Dr. Frank L. Wiswall, Jr. at p. 6. As to the residual authority of the Metropolitan, compare Certification of F. Andrew Stahl at pp. 20-25 and 29-33; and Supplemental Certification of F. Andrew Stahl (dated March 30, 1998) at pp. 2-6 with Certification of John A. Hollister, Esquire, No. 4 Supplementary Deposition at pp. 13-18.
[9] See, e.g., Sir Robert Phillimore, D.C.L., The Ecclesiastical Law of the Church of England, Vol. II, 2nd Ed. (London, 1895) at 68-71; E. Garth Moore, An Introduction to English Canon Law, (Clarendon Press, Oxford 1967).
[10] The Preamble to the ACC Constitution provides in relevant part: "We fully receive and consider ourselves bound, both as to Custom and the General Canon Law, by the Common Law of the Church as received through the Church of England."

Similarly, Canon 2 (Of Matters not Expressly Legislated Herein), of Title II (Of the Common Law of the Church), of the ACC canons provides in pertinent part:
Any matters not expressly legislated by or provided for by the Constitution and Canons of This Church ... shall be referred to and be subject to the General Canon Law and the Common Law of the Church ... or any and all other Anglican Laws Ecclesiastical in effect in part or parts of North America or elsewhere concerned prior to 1967 ...
[11] See ACC Constitution, Article VI, Section 6; ACC Canons, Title IV (Of the Office of the Metropolitan), Canon 2 (Of Canonical Visitations by the Metropolitan); ACC Canons, Title VI, Canon 1, Section 1.01; ACC Canons, Title XI, Canon 1, Section 1.03; ACC Canons, Title XIII, Canon 2, Section 2.03.
[12] While the Canons expressly provide that a Bishop Ordinary may inhibit clergy, priests and deacons from officiating in certain circumstances, ACC Canons, Title X, Canons 1.9, 7.02, they do not specifically speak of the inhibition of a Bishop by the Archbishop.
[13] The Canons provide that a Bishop may not be removed for "Abandonment of the Communion of the Church" unless:

(i) the Council of Advice of the Diocese certifies the Bishop's "abandonment" to the Metropolitan; (ii) the Council's certification is accompanied by a statement of the facts, acts, or declarations alleged to constitute such abandonment; (iii) the Metropolitan secures the written consent of three Bishops Ordinary to suspend the Bishop; (iv) the Metropolitan duly suspends the Bishop; and (v) the Bishop fails to deny the charges and demand a trial within six months of the notice of suspension. See ACC Canons, Title X, Canons 7.07 - 7.08.
[14] See Supplemental Certification of Seeland, dated March 1, 1998. See also Certification of Rev. Francis S. Blair III, dated March 15, 1998.
[15] To be sure, courts have recognized that membership in a religious organization, once acquired, carries with it important rights and status which are not extended to mere aspirants of membership. See, e.g., Baugh v. Thomas, supra; Hardwick v. First Baptist Church of Perth Amboy, supra.